**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| A.L.M. HOLDING CO.,<br>ERGON ASPHALT & EMULSIONS, INC., and<br>MEADWESTVACO CORP.,<br><br>        Plaintiffs,<br><br>v.<br><br>AKZO NOBEL SURFACE CHEMISTRY LLC,<br><br>        Defendant. | Civil Action No. 1:13-cv-1069-GMS<br><br>**JURY TRIAL DEMANDED** |
| A.L.M. HOLDING CO.,<br>ERGON ASPHALT & EMULSIONS, INC., and<br>MEADWESTVACO CORP.,<br><br>        Plaintiffs,<br><br>v.<br><br>ARR-MAZ CUSTOM CHEMICALS, INC.,<br><br>        Defendant. | Civil Action No. 1:13-cv-1070-GMS<br><br>**JURY TRIAL DEMANDED** |

## PLAINTIFFS' RESPONSIVE CLAIM CONSTRUCTION BRIEF

OF COUNSEL:

Nicholas B. Clifford  (admitted *pro hac vice*)
Mark A. Thomas (admitted *pro hac vice*)
Samir Mehta (admitted *pro hac vice*)
ARMSTRONG TEASDALE LLP
7700 Forsyth Blvd., Suite 1800
St. Louis, Missouri 63105

*Attorneys for Plaintiff
MeadWestvaco Corp.*

Dated:  August 18, 2014

Francis DiGiovanni (#3189)
M. Curt Lambert (#4882)
DRINKER BIDDLE & REATH LLP
222 Delaware Ave., Ste. 1410
Wilmington, DE 19801-1621
(302) 467-4200 (telephone)
(302) 467-4201 (facsimile)
francis.digiovanni@dbr.com
curt.lambert@dbr.com

*Attorneys for Plaintiffs*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................... ii

I.      INTRODUCTION ................................................................................................... 1

II.     ARGUMENT ........................................................................................................... 1

        A.      "functionally dry" / "essentially water-free" ........................................... 1

        B.      "non-foamed" .............................................................................................. 3

        C.      the "coated" terms ...................................................................................... 5

        D.      the "warm mix" terms ................................................................................ 6

        E.      "is produced at and is at" ........................................................................... 10

        F.      the "comparison" terms .............................................................................. 11

        G.      the "lubricating" terms ............................................................................... 13

        H.      "viscosity modifier" / "dispersant viscosity modifier" ....................... 15

        I.      "suitable aggregate" ................................................................................... 16

III.    CONCLUSION ....................................................................................................... 17

**TABLE OF AUTHORITIES**

**Cases**

*180s, Inc., et al. v. Gordini U.S.A., Inc.*,
  2010 U.S. Dist. LEXIS 30766 (D. Md., Mar. 30, 2010)............................................ 3

*Abbott Labs v. Andrx. Pharms., Inc.*,
  473 F.3d 1196 (Fed. Cir. 2007)............................................................................... 15

*Aventis Pharmaceuticals Inc. v. Impax Laboratories, Inc.*,
  2011 WL 94188 (D.N.J. Jan. 11, 2011) ................................................................... 17

*Bancorp Servs., LLC v. Hartford Life Ins. Co.*,
  359 F.3d 1367 (Fed. Cir. 2004)................................................................................. 8

*Classen Immunotherapies, Inc. v. Biogen Idec*,
  968 F. Supp. 2d 660 (D. Md. 2013) ........................................................................... 3

*Geneva Pharmaceuticals, Inc. v. GlaxoSmithKline PLC*,
  349 F.3d 1373 (Fed. Cir. 2003)................................................................................. 2

*Group One, Ltd. v. Hallmark Cards, Inc.*,
  407 F.3d 1297 (Fed. Cir. 2005)................................................................................. 9

*Intervet Inc. v. Merial Ltd.*,
  617 F.3d 1282 (Fed. Cir. 2010)............................................................................. 5, 6

*Intuitive Surgical, Inc. v. Computer Motion, Inc.*,
  2002 U.S. Dist. LEXIS 14752 (D. Del., Jul. 12, 2002) .............................................. 3

*Lexion Med., LLC v. Northgate Techs., Inc.*,
  641 F.3d 1352 (Fed. Cir. 2011)................................................................................. 9

*Molon Motor & Coil Corp. v. Merkle-Korff Industries, Inc.*,
  2006 U.S. Dist. LEXIS 27575 (N.D. Ill., April 26, 2006) ......................................... 3

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
  134 S. Ct. 2120 (2014)................................................................................................ 6

*Nellcor Puritan Bennett, Inc. v. Masimo Corp.*,
  402 F.3d 1364 (Fed. Cir. 2005)................................................................................. 4

*Phillips v. AWH Corp.*,
  415 F.3d 1030 (Fed. Cir. 2005)................................................................................. 9

*Robertson Transformer Co. v. General Electric Co.*,
  2014 WL 1675022 (N.D. Ill. Apr. 28, 2014) ............................................................ 7

**TABLE OF AUTHORITIES**

*Romala Stone, Inc. v. Home Depot U.S.A., Inc.*,
  2007 U.S. Dist. LEXIS 73098 (N.D. Ga. Sept. 28, 2007) ....................................................... 17

*Streck, Inc. v. Research & Diagnostic Sys., Inc.*,
  665 F.3d 1269 (Fed. Cir. 2012)................................................................................................ 5

*Takeda Pharmaceutical Co. v. Teva Pharmaceuticals USA Inc.*,
  542 F. Supp. 2d 342 (D. Del. 2008)......................................................................................... 10

*Teleflex, Inc. v. Ficosa North Am. Corp.*,
  299 F.3d 1313 (Fed. Cir. 2002)................................................................................................ 10

*Thorner v. Sony Computer Entm't Am., LLC*,
  669 F.3d 1362 (Fed. Cir. 2012)................................................................................... 13, 14, 15

*Vitronics Corp. v. Conceptronic, Inc.*,
  90 F.3d 1576 (Fed. Cir. 1996).................................................................................................. 4

**Statutes**
35 U.S.C. § 112................................................................................................................................ 7

## I.      INTRODUCTION

Defendants' assertion that more than half of the claim terms in dispute cannot be defined with reasonable certainty flies in the face of both the intrinsic evidence and the evidence of the understandability of these terms to persons of ordinary skill. Where Defendants do propose constructions (simultaneously with their incongruous indefiniteness arguments), they are unsupported by the intrinsic evidence and contradicted by the plain language of the patent. Plaintiffs' proposed constructions, on the other hand, harmonize the meaning and scope of the patent claims with the full intrinsic record. For the reasons that follow, Defendants' proposed constructions and indefiniteness arguments should be rejected, and Plaintiffs' proposed constructions should be adopted in their entirety.

## II.      ARGUMENT

### A.      "functionally dry" / "essentially water-free"

Plaintiffs and Defendants agree that the inventors defined the terms "functionally dry" and "essentially water-free" during prosecution of the patents in suit. In fact, the only difference between the parties' proposed constructions is that Plaintiffs' proposal gives effect to the inventors' express description of what "conventional or known warm mixes" are, i.e., foamed or emulsified warm mixes. This key component of Plaintiffs' proposed construction is *necessary* because the meaning of the phrase "conventional or known" has a temporal context; in other words, "conventional or known" to a person of ordinary skill today might mean something different than what the inventors meant in 2007. Fortunately, the inventors set forth what they meant by "conventional or known" warm mixes directly in the specification—*warm mixes utilizing <u>foamed</u> asphalt binders or <u>emulsified</u> asphalt binders*. Specifically, the inventors observed that, through their invention, warm mix production temperatures can be achieved without incorporating water like the "*foamed* asphalt binders or *emulsified* asphalt binders that

are used in conventional warm mix asphalt binder compositions." *See* JA Ex. A ('725 patent) at 2:30-42 (emphasis added).  Then, in the next sentence of the specification, the inventors defined "functionally dry" and "essentially water-free" by reference to "conventional or known warm mixes."  *Id.* at 2:43-47.  This construction incorporates the specification's definition of "conventional or known warm mixes" as those that utilize foamed or emulsified asphalt binders. Defendants, on the other hand, seek to *separate* the language of col. 2, li. 2:43-47 from its immediate context of col. 2, li. 2:30-42, and incorrectly assert that Plaintiffs' proposed "foamed or emulsified warm mixes" language "is found nowhere in the claims, specification, or prosecution histories."  D.I. 61 (Akzo Br.) at 6.

Defendants' objective in proposing their construction is apparently to bolster their indefiniteness arguments rather than to reach a claim construction that reflects the patent specification and the understanding of a person of ordinary skill in the art in a manner that will assist the fact finder.  Defendants' tactic is to propose an indefinite construction, urge the Court to adopt it, and then argue indefiniteness based on the construction that it proposed.[1]  Indeed, Defendants make the extraordinary admission that *their own proposed construction would render the claims invalid as indefinite*.  Akzo Br. at 7 (conceding that Defendants' proposed construction is "indefinite").  This tactic would turn claim construction on its head, and should be rejected.  *See Geneva Pharmaceuticals, Inc. v. GlaxoSmithKline PLC*, 349 F.3d 1373, 1383-84 (Fed. Cir. 2003) (rejecting a proposed construction that, if adopted, would have rendered the claim indefinite).

---

[1] The prosecution histories of the '725 and '466 patents undermine the credibility of Defendants' arguments.  At no point in the original US examinations of the '725 and the '466 patents did the Patent Office raise any indefiniteness challenges against any of the claim terms presently at issue.

In addition, Defendants criticize Plaintiffs' proposal (and their own proposal) for using the phrase "routinely used in." *Id.* Yet, terms like these are common in claim construction and have meaning to a person of ordinary skill in the art.[2] *See, e.g., Classen Immunotherapies, Inc. v. Biogen Idec*, 968 F. Supp. 2d 660, 689 (D. Md. 2013) (construing "pediatric immunogen" as "immunogen that was *routinely* administered after birth to children less than 16 weeks old in modern developed nations of moderate latitude in 1992") (emphasis added); *Intuitive Surgical, Inc. v. Computer Motion, Inc.*, C.A. No. 01-203-SLR, 2002 U.S. Dist. LEXIS 14752 (D. Del., Jul. 12, 2002) (defining various "robotic" terms as "the moving parts of a robotic system made of links and joints, where the joints *typically* have motors that operate through a drive mechanism to move the joints, and the motors are *typically* actuated by a computer controller") (emphasis added); *180s, Inc., et al. v. Gordini U.S.A., Inc.*, 2010 U.S. Dist. LEXIS 30766 (D. Md., Mar. 30, 2010) (defining "passageway" as "a way, typically having barriers at least on either side, that allows access.") (emphasis added); *Molon Motor & Coil Corp. v. Merkle-Korff Industries, Inc.*, 2006 U.S. Dist. LEXIS 27575 (N.D. Ill., April 26, 2006) (defining  "worm gear" as "a gear having a screw thread (for example, helical or spiral) that may mesh with a toothed wheel, *typically* used to connect non-parallel, non-intersecting shafts") (emphasis added).

For these reasons, the Court should adopt Plaintiffs' proposed construction and reject Defendants' proposed construction.

### B.     "non-foamed"

Curiously, Defendants' briefs do not contain a single supporting citation for their proposed construction of "non-foamed."  Instead, they focus solely on attacking Plaintiffs'

---

[2] Significantly, Defendants failed to describe any characteristics or qualifications of the person of ordinary skill in the art.  It is difficult to understand how Defendants can assert what a person of ordinary skill in the art would or would not know when Defendants did not even disclose the person's level of experience and education.

proposal.  *See* Akzo Br. 7-9.  Yet, Defendants' attack does not diminish the substantial intrinsic evidence that supports Plaintiffs' proposal (*see* Plaintiffs' Brief at 6-7), including the specification's use of the term "foamed asphalt binders" to refer to binders created by "inject[ing] a foaming, lubricating aqueous solution into a stream of asphalt cement."  '725 patent at 1:16-24, 2:39.

Defendants appear to adopt the position that "non-foamed" asphalt binder, as used in the asserted claims, can only be binder that is absolutely devoid of anything that may be regarded as foam.   Akzo Br. at 8.   This construction is divorced from the intrinsic record and the understanding of a person of ordinary skill in the art.  Defendants' own construction would exclude every single embodiment disclosed in the asserted patents, in violation of Federal Circuit precedent.  *See Nellcor Puritan Bennett, Inc. v. Masimo Corp.*, 402 F.3d 1364, 1368 (Fed. Cir. 2005) ("[A] construction that excludes all of the embodiments of an invention is 'rarely, if ever, correct.'") (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996)).  Specifically, Defendants assert that "*mere mixing* of a lubricating additive with binder and/or aggregate . . . may produce foam" (*id.*), but every embodiment disclosed in the asserted patents discloses mixing additive with binder and/or aggregate, thus every embodiment would be excluded by Defendants' proposed construction.

Defendants further insist that because the patentees did not provide a specific definition of the processes that are commonly used to produce foamed binder, then a person of ordinary skill would take the extraordinarily broad view that "non-foamed" can mean "*any* process or step that might result in the formation or presence of foam in the binder or composition," no matter how theoretical those processes or steps might be.  Akzo Br. at 8.[3]  Defendants' imaginative

---

[3] Defendants criticize Plaintiffs' proposed construction for being a "negative limitation" (Akzo

theory is incorrect because the patentees were simply relying on the well-understood distinction between foamed and non-foamed binders, a distinction needing no elaboration. It is well-established that "a patent specification need not disclose or teach what is known in the art." *Streck, Inc. v. Research & Diagnostic Sys., Inc.*, 665 F.3d 1269, 1288 (Fed. Cir. 2012).

For these reasons, the Court should reject Defendants' proposed construction, which is belied by the intrinsic record and the common sense of a person of ordinary skill in the art, and adopt Plaintiffs' proposed construction.

**C.     the "coated" terms**

Defendants' proposed construction of the "coated" terms blatantly imports a "100%" limitation from isolated Examples winnowed from the specification, but Defendants point to no justification for such a limitation. Defendants' construction therefore violates the Federal Circuit's instruction that limitations from examples in the specification may not be read into the claims. *See, e.g., Intervet Inc. v. Merial Ltd.*, 617 F.3d 1282, 1287 (Fed. Cir. 2010) ("Construing the claims in light of the specification does not, however, imply that limitations discussed in the specification may be read into the claims.").

Of the eleven Examples in the patent specification, only *three* mention 100% coating. JA Ex. A at Examples 5, 7, and 11. If "coated" means "100% coated," these disclosures would be redundant. In addition, the omission of a percentage of coating in the other Examples indicates that less than 100% coating is disclosed in those Examples. Moreover, as explained in Plaintiffs' Opening Brief, the specification describes coating in several other ways, including "acceptable" (2:64), "adequate" (3:3, 3:44, 4:66), "good" (11:11-12), "well coated" (11:36), and "thorough"

---

Br. at 8), but it is difficult to imagine the term "non-foamed" to be anything other than a negative limitation. Defendants' own proposal—mandating that the binder "does not contain foam"—is equally "negative."

(13:26).  All of these descriptors are consistent with usage in the industry, and therefore a skilled artisan would readily understand "coating" to mean coating of all or substantially all surfaces. *See* D.I. 63 (D'Angelo Decl.) at 6 ¶ 21.  Defendants' error is further highlighted by their disregard of all but one of these descriptors.  Apparently finding no fruitful dictionary definitions for "acceptable," "adequate," "good," or "well-coated," Defendants proffer cherry-picked dictionary definitions for the word "thorough" and assert that the claims "plainly require" 100% coating.  Akzo Br. at 10.  An incidental dictionary usage of a term not present in the claims carries no weight in construing the "coated" terms.

There is no justification for limiting the claim scope to only three exemplary embodiments in the specification, especially when doing so would exclude all other embodiments.  *Intervet Inc.*, 617 F.3d at 1287 ("It is . . . important not to confuse exemplars or preferred embodiments in the specification . . . with limitations that define the outer boundaries of claim scope.").  The Court should thus reject Defendants' proposed construction and adopt Plaintiffs' proposed construction.

**D.     the "warm mix" terms**

Defendants' arguments regarding "warm mix"—all of which pertain to alleged indefiniteness, not claim construction—are contradicted by the intrinsic record, the understanding of those in the asphalt industry, and even Defendant Akzo Nobel's own use of the terms.

First, the issue of indefiniteness is evaluated at the *claim* level, not the *term* level.  *See Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2129 (2014) ("[W]e read § 112, ¶ 2 to require that a patent's *claims*, viewed in light of the specification and prosecution history, inform those skilled in the art about the scope of the invention with reasonable certainty.") (emphasis added); *Robertson Transformer Co. v. General Electric Co.*, 2014 WL 1675022, *5 (N.D. Ill.

Apr. 28, 2014) ("[T]he question of indefiniteness proceeds at the level of the claims, taken as a whole, not at the level of individual terms."); MPEP § 2173.02 ("In reviewing a claim for compliance with 35 U.S.C. § 112, second paragraph, the examiner must consider the claim as a whole to determine whether the claim apprises one of ordinary skill in the art of its scope . . . ."). Defendants approach their indefiniteness arguments with such a myopic view that they fail to see that when viewed in context of the claims as a whole, the "warm mix" terms are easily understood—the claim language provides context to what "warm mix" is.  For example, "warm mix temperature" in claim 1 of the '725 patent is followed immediately by the phrase "at least 30 °F lower than a comparison temperature needed to produce a comparison paving composition . . . ."  Considering that context, it can hardly be argued that the use of "warm mix temperature" in the claim as a whole leads to indefiniteness of the claim.

Second, Defendants' concession that "warm mix asphalt paving composition" is sufficiently defined by the subsequent language (Akzo Br. at 12) applies equally to "warm mix temperature."  The phrase "warm mix temperature" is followed by "at least 30 °F lower than a comparison temperature needed to produce a comparison paving composition . . . ." (or similar text) in nearly all of its uses.  This defines the term.  Defendants' selective indefiniteness attack cannot stand.  Similarly, Plaintiffs' construction does not improperly "conflate[] the three-component asphalt composition with the subsequently claimed processing step for preparing the asphalt composition" (Akzo Br. at 12)—to the contrary, it embraces the three-component asphalt composition, which is defined in the claims themselves.

Third, Defendants disregard the understanding of a person of ordinary skill in the art by insisting that "warm mix" must be precisely defined with fixed temperature boundaries.  Akzo Br. at 12.  Persons having ordinary skill in the art would understand that warm mix temperatures are routinely defined by degree of reduction from comparable hot mix temperatures.  D.I. 63

(D'Angelo Decl.) at 4 ¶ 14.  The disclosure of the asserted patents is fully consistent with this understanding.  The claims consistently state that "warm mix" temperatures are at least 30° F lower than those temperatures used in comparable hot-mix asphalt, and the specification provides several examples of standard warm mix temperatures.  Akzo Br. at 10-11.

Fourth, Defendant Akzo Nobel employed, in its own contemporaneously-filed patent documents, the *very same conventions* that it now complains about in the asserted patents.  *See Bancorp Servs., LLC v. Hartford Life Ins. Co.*, 359 F.3d 1367, 1375–76 (Fed. Cir. 2004) (district court should consider evidence of accused infringer's own use of claim term in dispute).  Akzo Nobel's own resort to these conventions demonstrates the weakness of its accusations against the patents in suit.  Akzo Nobel's U.S. Patent No. 8,440,011, entitled "Asphalt Modifiers for 'Warm Mix' Applications Including Adhesion Promoter,"[4] uses the exact term that Akzo Nobel now claims is indefinite:

> **15**. The formulation of claim **14** wherein the temperature required to compact said asphalt is 15-60° F. lower than conventional hot mix asphalts.

*See* Second Declaration of M. Curt Lambert ("Lambert 2d Decl.") ¶ 3 Ex. A, claim 15; *compare* Akzo Br. at 14 (arguing that "the intrinsic evidence does not define 'conventional hot-mix asphalt' and thus it is indefinite").[5]  Obviously, Akzo Nobel recognized in November of 2007 that skilled artisans knew what "warm mix" and "conventional hot mix" meant.  This undermines Defendants' litigation-driven argument that "just what is a 'warm-mix' or a 'hot-mix' in the context of the ['725] patent, is indefinite and should not be left to the patentee to

---

[4] The '011 patent relates to Provisional Application No. 60/987,929, which has a substantially identical disclosure and was filed on November 14, 2007—just two months after the effective filing date of the patents in suit.  *See* Lambert 2d Decl. ¶ 4 Ex. B.

[5] Several claims of Akzo Nobel's '011 patent also recite the phrase "warm mix" without temperature limitations.  *See, e.g.,* '011 Patent, Claims 1, 14, 17, 19, 20.

manipulate as it sees fit to suit its case." Akzo Br. at 14.  Contrary to Defendants' assertion, the inventors of the patents in suit were simply employing standard terminology to describe technologies known to those of ordinary skill in the art when the original application for the '725 and '466 patents was filed.

Fifth, Defendants argue that "warm mix asphalt paving composition" should be construed without reference to temperature.  Akzo Br. at 12.  The claims at issue are expressly directed to compositions produced at temperatures at least 30° F lower than comparable hot-mix compositions.  *See, e.g.,* J.A. Ex. A, claim 1.  As with the other "warm mix" terms, Plaintiffs' proposed construction simply gives effect to the clear teaching of the claims and the specification.  Defendants cite no support for their insistence that "warm mix asphalt paving composition" should be construed without regard to the context in which it appears, and indeed, such an approach would be contrary to Federal Circuit instruction.[6]  *See Phillips*, 415 F.3d 1030, 1314 (Fed. Cir. 2005) ("the context of the surrounding words of the claim also must be considered in determining the ordinary and customary meaning of those terms") (citation omitted); *see also Lexion Med., LLC v. Northgate Techs., Inc.*, 641 F.3d 1352, 1356 (Fed. Cir. 2011) ("Limitations (b) and (c) of claim 11 inform the meaning of limitation (e) of the claim. This court prefers a claim interpretation that harmonizes the various elements of the claim to define a workable invention.").  Plaintiffs' proposed construction is correct precisely because it "harmonizes the various elements of the claim."[7]  *Id.*

---

[6] Defendants repeat this error in arguing that "warm mix paving composition" and "warm mix asphalt binder composition" should be construed without regard to other express claim limitations.  Akzo Br. at 13.

[7] Further, Defendants cite no authority for their assertion that correcting the phrase "warm mix asphalt binder composition" is "impermissible."  D.I. 61 at 11 n.3.  As explained in Plaintiffs' opening brief, the Court is free to correct errors evident from the face of the patent.  D.I. 62 at 10 n.6 (citing *Group One, Ltd. v. Hallmark Cards, Inc.,* 407 F.3d 1297, 1303 (Fed. Cir. 2005)).

Sixth, Defendants misread *Takeda Pharmaceutical Co. v. Teva Pharmaceuticals USA Inc.* in arguing that process steps cannot generally limit the plain meaning of compositions. Akzo Br. at 12-13 (citing 542 F. Supp. 2d 342 (D. Del. 2008)).  Directly prior to the section quoted by Defendants, the *Takeda* court stated:

> Just as "[t]he presence of acts recited in the claim does not transform a claim covering a thing . . . into one covering the process by which that thing is made," this recited sequence of steps is, conversely, not properly interpreted as a narrowing limitation on the nature of the claimed product (described by the manufacturing steps) *absent "words or expressions of manifest exclusion or restriction" indicating otherwise.*

*Takeda*, 542 F. Supp. 2d at 349 (citing *Teleflex, Inc. v. Ficosa North Am. Corp.*, 299 F.3d 1313, 1327 (Fed. Cir. 2002)) (emphasis added).  In *Takeda*, at claim construction, the patent holder attempted to import limitations from the specification to exclude certain embodiments from the ordinary meaning of "a pharmaceutical composition" with no express support for such a limitation in the prosecution history or specification.  *Id.* at 348.  The conditions of *Takeda* plainly do not apply in this case.  *Takeda* contemplates that a patent holder may in fact limit "the nature of the claimed product" by using "words or expressions of manifest exclusion or restriction."  *Id.*  Claim 1 of the '725 patent expressly limits the warm mix asphalt paving composition to a warm mix temperature at least 30º F lower than a comparison temperature.

For the foregoing reasons, the Court should reject Defendants' arguments that the "warm mix" claim terms are indefinite and adopt Plaintiffs' claim constructions.

### E.     "is produced at and is at"

This claim term includes two components: "is produced at" and "is at."  There is no dispute between Plaintiffs and Defendants on the first component.  However, the parties dispute the second component.  Defendants suggest that the claim term "is at" requires that the asphalt paving composition "is maintained at th[e] production temperature" (Akzo Br. at 16), apparently in perpetuity.  Such a view is unsupported by the intrinsic record, the extrinsic record, and the

knowledge of persons having ordinary skill in the art.  The intrinsic record indicates that paving compositions cool over time (JA Ex. A at 13:15-16 ("The compacted aggregate and asphalt mixture eventually hardens upon cooling.")), a principle well-understood by persons having ordinary skill in the art (D.I. 63 (D'Angelo Decl.) at 2 ¶ 5).  Defendants' construction is a nonsense construction, for the simple reason that a paved road is not typically "maintained" at any particular temperature, much less the temperature at which the asphalt paving composition was produced.  At that temperature, it would not even be a road.[8]

Defendants propose a construction that would require the warm mix asphalt paving composition to exist indefinitely in a condition that is physically impracticable, unusable, and not described in any manner within the specification of the '725 or '466 patents.  The Court should therefore reject Defendants' proposed construction and adopt Plaintiffs' proposed construction.

**F.  the "comparison" terms**

The distinction between the parties' proposed constructions is the presence of the word "comparable" in Plaintiffs' proposed construction.   Contrary to Defendants' assertions, Plaintiffs' construction (including its use of the word "comparable") is consistent with the specification and gives effect to the meaning of the word "comparison" in the disputed terms. This context is useful to a fact finder and is consistent with the manner in which a person of ordinary skill in the art would understand the "comparison" terms.   Otherwise, a person of ordinary skill in the art would be left to wonder precisely what is being compared, which is the inevitable result of Defendants' omission of the "comparison" limitation altogether.  To be clear, Defendants' proposed construction is impermissibly broad because it eviscerates the entire

---

[8] Contrary to Defendants' nonsensical argument, Plaintiffs' construction requires that the composition is at a warm mix temperature "at some point" after it is produced, i.e., temporarily, after which it will naturally cool.

purpose of the patented invention, which is to create a paved surface using warm mix technology *that could otherwise be created* using prior art technologies.  Obviously, the paved surfaces must be comparable.  *See, e.g.*, D.I. 63 (D'Angelo Decl.) at 3 ¶ 7.

In their criticism of Plaintiffs' proposed construction, Defendants incorrectly argue that the word "comparable" "is found nowhere in the intrinsic evidence" and that "nowhere in the specification or prosecution history are features identified for comparing one composition to another."  Akzo Br. at 17.  First, variants of the word "comparable," including "compared," "comparison," and "comparing" appear *ten other times* in the specification of the '725 and '466 patents.  *See, e.g.*, '725 patent at 6:48-52, 7: 29-32, 48-54, 61-64, 12:4-6, and Table 2.  More notably, as previously explained by Plaintiffs, the examples in the patent specification are structured such that the comparison is between *comparable* paving compositions, i.e., compositions wherein the only differences are the use of additives and the operative temperatures, yet the resulting pavements have *comparable* characteristics such as pavement densities.  *See* D.I. 62 at 15.  Furthermore, demonstrating throughout the examples how to determine whether asphalt mixes are comparable, the inventors present specific comparisons between warm mix asphalt paving compositions using the claimed invention and conventional hot mix asphalt paving compositions, such as rut test comparisons and air void comparisons.  *See, e.g.,* J.A. Ex. 1 at 9:3-6; 10:3-15.  The patent specification directly contradicts Defendants' assertion that "the intrinsic evidence provides no guidance to what constitutes a 'comparable' composition."  Akzo Br. at 17.  Accordingly, the Court should reject Defendants' unsupported construction and adopt Plaintiffs' proposed construction because it provides the proper context for the fact-finder.

### G.     the "lubricating" terms

Defendants Akzo Nobel and Arr-Maz propose competing and inconsistent constructions of the "lubricating" terms.  On the one hand, Akzo Nobel contends that the "lubricating" terms are not ambiguous, and thus there is no need to construe them.  Akzo Br. at 18-19.  Plaintiffs agree with Akzo Nobel that the "lubricating" terms have their plain and ordinary meaning.  Plaintiffs' Br. at 16.  That being said, if the Court requires a further construction, "allowing easier motion between two or more objects" is a commonly understood dictionary definition of the term "lubrication" (*id.* at 16-17) that does not contradict the intrinsic evidence, and would be understood as such by a person of ordinary skill in the art (D.I. 63 (D'Angelo Decl.) at 5 ¶ 15).  Akzo Nobel accuses Plaintiffs of "complicat[ing]" and "rewrit[ing]" the claim terms and "reading in" new limitations.  Akzo Br. at 23.  This accusation is both moot and incorrect because Plaintiffs and Akzo Nobel agree that the "lubricating" terms need no construction.

On the other hand, Defendant Arr-Maz's argument is built entirely on the mistaken premise that "[t]he '725 patent expressly defines 'lubricating.'"  D.I. 59 (Arr-Maz Opening Br.) at 6.  Arr-Maz contends that the "lubricating" claim terms must be defined by "the specific testing conditions disclosed in the patent."  *Id.* at 5-6.  To the contrary, the patentees used "lubricating" in its ordinary and customary sense throughout the entire intrinsic record.

To act as its own lexicographer, a patentee must "clearly set forth a definition of the disputed claim term other than its plain and ordinary meaning."  *Thorner v. Sony Computer Entm't Am., LLC*, 669 F.3d 1362, 1365-66 (Fed. Cir. 2012).  The patentee must "clearly express an intent" to redefine the term.  *Id.*  The standard for determining whether an inventor has provided such clear intent is "exacting."  *Id.* at 1366.  Arr-Maz fails to identify any such clear intent by the patentees to deviate from the ordinary meaning of "lubricating."  Instead, Arr-Maz plucks language out of context to manufacture an argument that the term has a special meaning.

Arr-Maz cites language describing mere observations of the *effects* of lubricating agents—but Arr-Maz omits the "observations" language. Arr-Maz Br. at 6. The entire passage from which Arr-Maz selected its purported "express definition" is provided below, with the omitted language in bold print:

> **While not intending to be bound by theory, the present invention is based, in part, on the observations that** the lubricating agents and additives **disclosed in this application** provide a warm mix having desired visco-lubricity characteristics or properties.

JA Ex. A at 5:12-16 (emphasis added). As the text demonstrates, the patentees simply described an observation of the *effects* of lubricating additives. Because it does not "clearly express an intent" to redefine "lubricating," this falls well short of the "exacting" standard for finding that the patentee acted as its own lexicographer. *See Thorner*, 669 F.3d at 1366.

Arr-Maz's argument is further undermined by the evidence demonstrating that, when the patentees wanted to define a term, they knew how to clearly express their intent to do so. Immediately after the passage that Arr-Maz mistakenly identifies as a definition, the patentees expressly defined a *different* term—"visco-lubricity"—in an unambiguous manner:

> As used in this application the term "visco-lubricity" means a characteristic of a material that it exhibits under high rotational velocity as the gap thickness of the material being tested approaches zero.

JA Ex. A at 5:16-19. As with "functionally dry" (discussed in Section A *supra*), this clear definition of "visco-lubricity" demonstrates that, when the patentees intended to assign a specific definition to a term, the patentees were quite capable of doing so. The patentees' practice of providing unambiguous definitions for certain terms used in a novel manner is "significant evidence" that they did *not* intend to assign a novel meaning to "lubricating." *See Abbott Labs v. Andrx. Pharms., Inc.*, 473 F.3d 1196; 1210 (Fed. Cir. 2007) (stating that the fact that the patentee

provided unambiguous definitions for other terms, but not for the term in question, was "significant evidence" that patentee did not expressly define term in question).

Arr-Maz's argument also falls flat in view of statements made during prosecution that the normal force test "*may* be used to select the type and concentration of lubricating additives." D.I. 59 (Arr-Maz Opening Br.) at 11 (citing JA Ex. H at A-101) (emphasis added). Arr-Maz is incorrect to assert that additives "*must* be filtered" by a test that "*may* be used" to select them. *Id*. (emphasis added).

Arr-Maz's extensive discussion of certain examples in the specification (Arr-Maz Br. at 8-11) misses the mark. Without question, the patentees diligently described their observations of the *effects* of lubrication. Indeed, most if not all of the written description is devoted to explaining how the invention works. The question, however, is whether the patentees used "lubricating" in a manner "other than its plain and ordinary meaning." *Thorner*, 669 F.3d at 1366. Arr-Maz fails to identify even a single instance in which the patentees used "lubricating" in anything other than its customary usage. Thus, Federal Circuit precedent dictates that the term should have its plain and ordinary meaning.

**H. "viscosity modifier" / "dispersant viscosity modifier"**

Yet again, Defendants argue that the patents in suit are invalid as indefinite merely because the patents in suit do not provide a glossary of terms. Arr-Maz Br. at 13-14. No such glossary is needed because, among other things, the claim terms in dispute would be well understood to persons of ordinary skill in the art in view of the specification. The patent specification describes viscosity modifiers and dispersant viscosity modifiers by reference to their well-known use in engine lubricating oils. *See* JA Ex. B ('466 patent, col. 4, ll. 4:42-54). Then, the specification goes further and lists specific classes of chemicals that are known viscosity modifiers and dispersant viscosity modifiers. *Id*. In addition, as Plaintiffs previously

explained, other patents from the same time period demonstrate that the terms "viscosity modifier" and "dispersant viscosity modifier" refer to specific, well-known classes of additives. Plaintiffs' Br. at 17-18.  Thus, there is no basis for Defendants' argument that "the intrinsic evidence does not inform, with reasonable certainty, a person of ordinary skill in the art about the scope of the claims that include these phrases."  Arr-Maz Br. at 13.  To the contrary, the specification (and even a cursory look to contemporaneous extrinsic evidence) provides more than enough information for a person of ordinary skill in the art to understand what is covered by the claim terms, and there was no need for the inventors to define the terms with anything more than the considerable precision already in the specification.  The Court should therefore adopt Plaintiffs' proposed constructions of these terms and reject Defendants' meritless indefiniteness argument.

## I.     "suitable aggregate"

Defendants' position is that this term is incapable of construction to a reasonable certainty, simply because of the use of the term "suitable."  Akzo Br. at 20.  As Plaintiffs previously explained, a person of ordinary skill in the art would understand the variability of an aggregate's properties, and would also understand how to select an aggregate suitable for a particular paving project.  Plaintiffs' Br. at 19.  There is nothing unreasonably uncertain about the word "suitable" in light of the specification's disclosure of aggregates having different properties which need to be considered when choosing an aggregate for a paving project.  *See* '466 patent at 2:56-58; 3:10; 9:3; 10:16.  Rather, in light of these variations, a person of ordinary skill in the art would consider the inventors' use of the word "suitable" to be eminently reasonable and not at all unclear.  It should further be noted that district courts have not

previously had problems understanding and construing the word "suitable" in the claim construction context.[9]  The Court should therefore adopt Plaintiffs' proposed construction.

## III.    CONCLUSION

For the reasons stated herein, and those set forth in Plaintiffs' Opening Brief, Plaintiffs respectfully requests that the Court adopt Plaintiffs' proposed constructions and reject Defendants' claim construction positions for the disputed claim terms.


Dated:  August 18, 2014

OF COUNSEL:

Nicholas B. Clifford  (admitted *pro hac vice*)
Mark A. Thomas (admitted *pro hac vice*)
Samir Mehta (admitted *pro hac vice*)
ARMSTRONG TEASDALE LLP
7700 Forsyth Blvd., Suite 1800
St. Louis, Missouri 63105
(314) 621-5070 (telephone)
(314) 621-5065 (facsimile)
nclifford@armstrongteasdale.com
mathomas@armstrongteasdale.com
smehta@armstrongteasdale.com

*Attorneys for Plaintiff*
*MeadWestvaco Corp.*

/s/ Francis DiGiovanni
Francis DiGiovanni (#3189)
M. Curt Lambert (#4882)
DRINKER BIDDLE & REATH LLP
222 Delaware Ave., Ste. 1410
Wilmington, DE 19801-1621
(302) 467-4200 (telephone)
(302) 467-4201 (facsimile)
francis.digiovanni@dbr.com
curt.lambert@dbr.com

*Attorneys for Plaintiffs*

---

[9] *See Aventis Pharmaceuticals Inc. v. Impax Laboratories, Inc.*, No. 02–1322 (GEB) (consol.), 2011 WL 94188 (D.N.J. Jan. 11, 2011) (construing the claim term "suitable antiadherent"); *Romala Stone, Inc. v. Home Depot U.S.A., Inc.*, 2007 U.S. Dist. LEXIS 73098 (N.D. Ga. Sept. 28, 2007) (construing the term "suitable for installation by the average consumer").