```
 1                 IN THE UNITED STATES DISTRICT COURT

 2                   FOR THE DISTRICT OF DELAWARE

 3                              -   -   -

 4   A.L.M. HOLDING CO.,              )      Civil Action
     ERGON ASPHALT & EMULSIONS,       )
 5   INC., and MEADWESTVACO CORP.,    )
                                      )
 6              Plaintiffs,           )
                                      )
 7        v.                          )
                                      )
 8   AKZO NOBEL SURFACE CHEMISTRY     )
     LLC,                             )
 9                                    )
                Defendant.            )      No. 13-1069-GMS
10
                                -   -   -
11
     A.L.M. HOLDING CO.,              )      Civil Action
12   ERGON ASPHALT & EMULSIONS, INC.,)
     and MEADWESTVACO CORP.,          )
13                                    )
                Plaintiffs,           )
14                                    )
          v.                          )
15                                    )
     ARR-MAZ CUSTOM CHEMICALS, INC., )
16                                    )
                Defendant.            )      No. 13-1070-GMS
17
                                -   -   -
18
                         Wilmington, Delaware
19                    Monday, September 29, 2014
                               9:30 a.m.
20                         Markman Hearing

21                              -   -   -

22   BEFORE:  HONORABLE GREGORY M. SLEET, U.S.D.C.J.

23

24

25
```

```
 1   APPEARANCES:

 2           FRANCIS DiGIOVANNI, ESQ., and
             M. CURT LAMBERT, ESQ.
 3           Drinker Biddle & Reath LLP
                         -and-
 4           NICHOLAS B. CLIFFORD, ESQ., and
             MARK THOMAS, ESQ.
 5           Armstrong Teasdale LLP
             (St. Louis, MO)
 6
                             Counsel for Plaintiffs
 7
             BRIAN FARNAN, ESQ.
 8           Farnan LLP
                         -and-
 9           RICHARD DeLUCIA, ESQ.,
             MICHAEL D. LOUGHNANE, ESQ.,
10           MERRI C. MOKEN, ESQ., and
             PATRICK BIRDE, ESQ.
11           Kenyon & Kenyon LLP
             (New York, NY)
12
                             Counsel for Akzo Nobel Surface
13                           Chemical LLC

14           JOHN G. DAY, ESQ.
             Ashby & Geddes
15                       -and-
             ROBERT L. LEE, ESQ.,
16           SHRI M. ABHYANKAR, ESQ., and
             NATALIE CLAYTON, ESQ.
17           Alston & Bird LLP
             (Atlanta, GA)
18
                             Counsel for Defendant
19                           Arr-Maz Custom Chemicals, Inc.

20                       -   -   -

21

22

23

24

25
```

1           THE COURT:  Good morning.  Please, take your

2    seats.

3           Let's begin with introductions, beginning with

4    the plaintiff, please.

5           MR. DiGIOVANNI:  Thank you, Your Honor.  Frank

6    DiGiovanni from Drinker Biddle & Reath for all three

7    plaintiffs, MeadWestvaco, ALM Holdings and Ergon.

8           With me is Nicholas Clifford of the Armstrong

9    Teasdale firm in St. Louis.  Mr. Clifford is representing

10   MeadWestvaco, as is Mark Thomas, also from Armstrong

11   Teasdale.

12           Also with me from my firm is Curt Lambert.

13           THE COURT:  All right.

14           Mr. Farnan is going to step into the breach?

15           MR. FARNAN:  Good morning, Your Honor.  Brian

16   Farnan on behalf of Akzo Nobel Custom Chemicals.  With me is

17   Mary Moken, Richard DeLucia, Michael Loughnane, and Patrick

18   Birde, all from Kenyon & Kenyon in New York City.

19           We have one preliminary matter to address when

20   Your Honor is ready.

21           THE COURT:  Let's finish introductions.

22           MR. DAY:  Thank you, Your Honor.  Good morning,

23   Your Honor.  John Day from Ashby & Geddes for Arr-Maz Custom

24   Chemicals in the 13-1070 case.  With me today is Robert Lee

25   from Alston & Bird, who will be presenting for us, Shri

1    Abhyankar, and Natalie Clayton, all from Alston & Bird in

2    Atlanta.

3              Thank you, Your Honor.

4              THE COURT:  Mr. Farnan.

5              MR. FARNAN:  Your Honor, the only issue is how

6    to proceed today.  We recommend that we go term by term, as

7    we have done in the past.  I believe the plaintiff wants to

8    go straight for an hour and a half and turn it over to us.

9    We request to go term by term for the argument.

10             THE COURT:  Counsel.

11             MR. DiGIOVANNI:  Briefly, Your Honor.  We

12   thought it made sense to follow generally the way we briefed

13   it, especially with a time constraint on these number of

14   terms, we thought it made sense to have us doing our entire

15   presentation first.

16             THE COURT:  We set aside three hours in total.

17             MR. DiGIOVANNI:  Yes, Your Honor.

18             THE COURT:  And, Mr. Farnan, why do you think

19   term by term versus straight through makes sense?

20             MR. FARNAN:  Given the number of terms, Your

21   Honor, to keep everyone focused, and for the ease of the

22   Court.

23             THE COURT:  You think my attention span is going

24   to wane?

25             MR. FARNAN:  I know mine will.

1              THE COURT:  I don't have a vested interest one

2   way or the other.  If you really care, I will make a call.

3   But I just as soon work on what you think makes the best

4   sense to present the terms to me.  Term by term we do;

5   entire presentation we do.  We have done it all kinds of

6   ways.  The only thing I haven't done is put witnesses on

7   that witness stand to hear on claim construction.  So I

8   don't care, quite frankly.

9              MR. DiGIOVANNI:  Your Honor, we still believe it

10  makes sense to go through, if we want to get this finished,

11  that's the way we think.

12             THE COURT:  We will go straight through.

13  Plaintiff will have the first word, defense will then speak.

14  And I will give a response, brief response, unless I

15  interrupt and we interrupt in a dialogue.  So I may blow the

16  whole thing up.  We will see.  Let's go.

17             MR. DiGIOVANNI:  Thank you, Your Honor.

18             Your Honor, Mr. Clifford will begin our

19  presentation.

20             THE COURT:  Okay.

21             MR. CLIFFORD:  Thank you, Your Honor.  We

22  appreciate the opportunity to speak to you about these claim

23  constructions.

24             THE COURT:  Do you have anything you want to

25  pass up?

1             MR. CLIFFORD:  May I approach?

2             THE COURT:  Yes.

3             All right, counsel.

4             MR. CLIFFORD:  Your Honor, today we would like

5    to begin with a short video, a three-and-a-half-minute video

6    from the National Asphalt Paving Association, which

7    introduces warm mix to the Court.

8             THE COURT:  This is on the technology by way of

9    tutorial?

10            MR. CLIFFORD:  Yes, Your Honor.  I will speak

11   briefly after the short video.

12            THE COURT:  All right.  Let's go.

13            (Video played.)

14            MR. CLIFFORD:  Thank you, Your Honor.

15   Appreciate the opportunity to present that video.

16            I would like to speak briefly about the

17   background on the technology here.

18            This is an asphalt technology relating to

19   asphalt pavement that's used in roads throughout the United

20   States and the world.

21            The predecessor to the warm mix technology

22   that's described in the patents is called hot mix.  Hot mix

23   has been used to make asphalt pavement for many decades.

24   First used in the United States in the 1860s.

25            There are certain essential components and

1    methods that are well known.  Hot mix asphalt uses

2    approximately 95 percent aggregate and five percent asphalt.

3    It's typically mixed at temperatures above 300 degrees

4    Farenheit.  And as you see in this picture here, Your Honor,

5    it is mixed at a hot mix plant using this mixing drum and

6    burner.

7              There are certain constituent elements that

8    appear in all asphalt pavement, the first of which is

9    aggregate, which is a mix of various sizes of rock, that

10   would include gravel, sand, and stone.  Those mixes vary,

11   however, depending on local conditions and availability.

12   Sometimes aggregate is mixed into asphalt mixes strictly

13   using virgin aggregate.  Other times there are mixes that

14   include reclaimed asphalt pavement, or RAP.  You will see

15   that in the patent discussed.

16             Another constituent element of asphalt pavement

17   is asphalt binder.  Binder is known by various names, from

18   binder to bitumen to asphalt cement, and asphalt by itself.

19             Asphalt binder must be heated in order to be

20   blended into a mix.  Asphalt binder is a form of petroleum

21   that is found in natural deposits as well as a refined

22   product derived from crude oil.

23             There are various performance grades of asphalt

24   cement or asphalt binder.  You will see in the specification

25   discussion of performance grades like PG28.  Those relate

1    generally to the high and low temperatures at which that

2    particular grade of asphalt binder is intended to perform.

3              Another expression relating to asphalt binder is

4    neat asphalt binder.  That refers to unmodified asphalt

5    binder.  Asphalts can be modified with additives such as

6    polymers, which can be used to address certain adhesion

7    qualities.  Other types of asphalt binders can include

8    emulsions and additives like antistrips.

9              I mentioned before that these asphalt mixes are

10   mixed.  There is an asphalt plant that is usually located

11   within the general location of a jobsite where the aggregate

12   and the asphalt binder are mixed.  Once it is mixed -- this

13   is an image of the mixing drum itself, where you can see on

14   the right side that the aggregate is loaded above a burner

15   to heat it.  It's then mixed with the RAP, the recycled

16   constituent.  And then the liquid asphalt is mixed in this

17   turning drum with the aggregate, and then it comes out as

18   hot mix at the other end.

19             Once it leaves the drum, it then is loaded into

20   a silo.  The silo can be used for temporary storage.  And

21   then it is loaded into trucks like you see here for ultimate

22   transportation to the site.  Once it's transported to the

23   site, it is loaded into a paving machine.  Here is an image

24   of the paving machine, Your Honor, that is used to lay down

25   the mix onto the road surface while it is hot.

 1                    After the paving takes place, the final step is

 2       compaction.  It must be compacted promptly while the mix is

 3       still hot in order to achieve the necessary pavement

 4       densities that are required by the job specifications.  If

 5       it is not compacted properly, there is a risk of pavement

 6       failure.

 7                    There are a number of disadvantages of that

 8       traditional hot mix technology.  The high temperatures that

 9       are used, 300 degrees or more, can cause the asphalt itself

10       to degrade rapidly.  Of course, maintaining that high

11       temperature can be very expensive for the contractors that

12       are mixing the mix.

13                    The high temperatures also cause hazardous

14       emissions, which can be harmful to the environment, as well

15       as a significant on-the-job exposure for workers.

16                    The use of hot mix can limit the ability to use

17       the RAP or the reclaimed asphalt pavement.  And the

18       temperatures that are required, the high temperatures, are

19       hard to maintain, and as a result, in colder weather, it

20       doesn't work as well.  So there is a limited time window for

21       the paving season.  And, in fact, because the temperatures

22       drop rapidly from hot mix to ambient temperatures, that

23       limits the amount of time from the mixing ultimately to the

24       compaction.  So the time window is relatively short.

25                    So in light of those disadvantages of hot mix,

1    in the late 1990s, a technology called warm mix asphalt was

2    developed.  Warm mix has a basic widely understood meaning

3    in the asphalt industry.  It refers to producing asphalt

4    mixes using reduced mixing and compaction temperatures

5    relative to conventional hot mix.

6              There are many advantages to warm mix, Your

7    Honor.  And I would point out that the United States

8    Department of Transportation Federal Highway Administration,

9    has for quite some time recognized these advantages, such as

10   the ones that we have quoted from the FHA'S website on the

11   screen, Your Honor.  This list is very similar to what we

12   heard in that introductory video.

13             Warm mix technology was first introduced in the

14   United States in the early 2000s.  There are some early

15   technologies that preceded the technology in the invention

16   in the patents in suit.  Those earlier predecessor warm mix

17   technologies included foamed asphalt and asphalt emulsions,

18   among others.

19             Let me talk very briefly, Your Honor, about

20   these predecessor technologies, because I think they relate

21   directly to the claims.

22             You will see in the claims mention of foaming,

23   or foamed, non-foamed binder.  Let's talk about what foamed

24   asphalt is.

25             In foamed asphalt warm mix technology, there is

1    cold water that gets mixed with the hot asphalt in that

2    drum.  And it results in bubbling or foaming of the asphalt.

3    It's immediately then mixed within that drum that we saw

4    with the aggregate, but at lower temperatures, which can be

5    30 to 100 degrees -- or 20 to 30 degrees lower than standard

6    hot mix temperatures when the foamed asphalt technology is

7    used.  But it had significant drawbacks because of all this

8    introduction of water into the system.

9           The asphalt binder emulsion technology involves

10   asphalt, water, and an emulsifier that is mixed using a

11   special device called a colloid mill, which shears the

12   asphalt into very tiny microscopic drops that are blended

13   with the water.  And that type of emulsion technology can be

14   used for lowering temperatures while maintaining the mix of

15   the water, the emulsifier, and the asphalt.

16          There are many different types of applications

17   that can be used with this emulsion technology.

18          The disadvantages of those predecessor

19   technologies led to a development by our team of inventors

20   that came up with an innovation in mid-2007 that has been

21   transforming the asphalt industry.  They removed the foaming

22   process from the predecessor warm mix application.  They

23   removed the addition of the water that occurred because of

24   the foaming, and are using lubricating additives, like

25   surfactants, which is a type of surface active agent that

1    reduces the surface tension of a liquid in which it is

2    dissolved.  That additive is used to mix with the asphalt

3    and the aggregate at warm mix temperatures.

4         So these types of additives, Your Honor, you

5    will see, have a great deal of flexibility.  They can be

6    used on site, where that hot mix plant we saw, these totes

7    that contain the liquid can be used there, they can be used

8    at a variety of different locations, ultimately allowing

9    more flexibility in the ability to create warm mixes.  It

10   also had improvements over the predecessor technologies by

11   eliminating this need for added water, but was able to

12   achieve comparable hot mix composition performance

13   characteristics.

14        There are several different types of these

15   chemical lubricating additives that are at issue in this

16   case.  MeadWestvaco, one of the plaintiffs, has a product

17   called Evotherm, Akzo Nobel has a product called RediSet LQ,

18   and Arr-Maz has a product called Adhere LOF 65-00 with

19   Cecabase RT 945.

20        I would like to direct your attention now, Your

21   Honor, to the patents.  The patents include a composition

22   patent, that is the '725 patent, and a method patent, which

23   is the '466 patent.  The '725 patent has previously been

24   through two reexams before this litigation was initiated.

25        The current claim language that we are going to

1    address today, Your Honor, relates to the language approved

2    in the reexams that you will see on the reexamination

3    certificate for the '725 patent.

4            The key components of the composition patent

5    include binder.  Of course, we have talked about that.  But

6    one of the key terms is "essentially water free non-foamed

7    binder," which I will get to in a minute.  The aggregate is

8    fundamentally the same as what we saw in the presentation on

9    the background section on hot mix, and lubricating additive.

10   We will talk about more about what lubricating means today.

11           These are all combined and produced or mixed at

12   temperatures that are 30 degrees Farenheit or more lower

13   than for a comparable hot mix.

14           The steps of the method patent, the key

15   components involve mixing of those constituent elements of

16   binder, aggregate and lubricating additive, all at 30

17   degrees lower than the comparable hot mixes, and the paving

18   step and the compacting step are part of the method claims.

19           As I mentioned just a second ago, Your Honor,

20   the patents set up this comparative structure that involves

21   taking this warm mix that has been produced at 30 degrees or

22   more lower than a comparable hot mix temperature for hot mix

23   that is mixed without the lubricating additive.

24           The method claims have a very similar structure.

25   One thing I would like to point out is that the patents in

1    suit do not have an absolute temperature range.  And as a

2    result, it's always a comparative range relative to a

3    comparable hot mix temperature, depending upon the type of

4    grade of asphalt that's being used.  In other words, the

5    patents set up a structure that is an apples-to-apples

6    comparison, so that if you are taking a certain type of

7    asphalt mix you can do it with hot mix at a certain

8    temperature without the additive, but if you use it

9    according to the invention, you are able to achieve that

10   using warm mix temperatures that are 30 degrees or more

11   lower.

12            Briefly, Your Honor, the defendants, as you

13   know --

14            THE COURT:  Indefiniteness is for another day,

15   counsel.

16            MR. CLIFFORD:  I will go right ahead, Your

17   Honor.

18            Let me get now to the first claim that is at

19   issue, Your Honor.  That is the "functionally dry and

20   essentially water-free element."

21            The parties here offer very similar

22   constructions.  The difference here that I would like to

23   draw your attention to is that the plaintiffs' construction

24   explains what is meant by the phrase "conventional or known

25   warm mixes."  And we explain it by that parenthetical that

1    is well known to persons of ordinary skill, the reference to

2    foamed or emulsified warm mixes.

3              So you will see that the language, as it appears

4    in this representative claim, which, of course, we have up

5    on the boards here for you to see in their entirety --

6              THE COURT:  I have the claims.

7              MR. CLIFFORD:  Great.  It's a reference to the

8    asphalt binder itself.  The asphalt binder is to be

9    functionally dry or essentially water free.  These two

10   phrases, Your Honor, compliment each other in reference to

11   the water content of that asphalt binder.  But the

12   specification is careful to explain that warm mix

13   composition itself is not intended by these phrases to be

14   completely free of water.  Instead, for example, the water

15   content of the aggregate may itself still enter the system.

16             We know that rock actually has water content in

17   it.  So we are not intending these phrases, these terms, to

18   mean completely free of water.

19             THE COURT:  So the plaintiff has defined the

20   terms?

21             MR. CLIFFORD:  Exactly, Your Honor.  The

22   expression "functionally dry essentially water free" in the

23   specification has a section that both the plaintiffs and the

24   defendants rely upon for their similar constructions.  But

25   what I would point out to Your Honor is that the defendants

1    here have ignored the entirety of this particular section of

2    the specification.  Both parties cite to this particular

3    highlighted section.  But what the defendants ignore is the

4    rest of the context in which that excerpt appears.

5              Plaintiffs' construction gives true meaning to

6    the phrase "conventional or known warm mixes" because the

7    phrase before, which states it's not necessary or essential

8    to use foamed asphalt binders or emulsified asphalt binders

9    that are used in conventional warm mix asphalt binder

10   compositions, mixtures and paving processes, that gives

11   context to what is said in the very next sentence.

12             The interesting thing about the defendants'

13   construction, Your Honor, is that they are arguing in their

14   brief, which we cite here for you, that even their own

15   construction, which, of course, doesn't have that

16   parenthetical that we have in ours, would result in the

17   claims being indefinite.  Our view, Your Honor, is that that

18   is a direct violation of Federal Circuit precedent, which I

19   cite for you here, Your Honor.  We believe that our

20   construction avoids any sort of indefiniteness problem.

21             That's all I have on essentially water free

22   function -- "functionally dry, essentially water free."  If

23   you have questions, Your Honor, I will answer them.  If not,

24   I will moved on to the next term.

25             "Non-foamed" is the next term, Your Honor.  The

1    principal difference here between the competing

2    constructions, Your Honor, is that the plaintiffs'

3    construction, "not produced using a foaming process,"

4    differentiates prior art that utilizes a foaming process.

5    So by incorporating the notion of a foaming process into our

6    proposed construction, we are clarifying that non-foamed

7    differentiates the invention from the prior art.  The

8    defendants, however, have this litigation-driven focus on

9    whether the binder contains any foam, which we believe has

10   to do with an argument, a noninfringement argument, perhaps,

11   that they are trying to craft around incidental foam that

12   may appear in the system whenever you mix aggregate with

13   binder.

14            So here is an example of the claim language,

15   Your Honor.  This claim language here, which uses the phrase

16   "non-foamed," focuses on the verb for foaming or to foam,

17   but it uses the past tense of that verb.  This necessarily

18   incorporates a notion of action or a process of foaming.  We

19   believe plaintiffs' construction reflects this active

20   process.  The defendants' proposed construction does not

21   incorporate the proper meaning of the verb foam.  Instead ,

22   they focus on a noun of that particular word for foam.

23            So with respect to non-foamed, Your Honor, we

24   want to make sure you understand, of course, what it is that

25   non-foamed is referring to.  And it's the process of foaming

1    that I described earlier.  We saw the diagram earlier in the

2    tutorial portion.  This is an example of a device used in

3    the foaming, that's an attachment through which the asphalt

4    binder must go before entering into the drum.

5             The specification tells us, Your Honor, that

6    foamed asphalt is not part of the invention.  But it doesn't

7    say that foam isn't part of the invention or can't be in the

8    system.

9             What it says, Your Honor, is that foamed, or the

10   foaming process, is not part of the invention.  This excerpt

11   makes that very clear by stating it's not an essential part

12   of the foamed asphalt binders.  There is no question as to

13   what that is a reference to.  It's a reference to a process

14   that injects a foam or lubricating aqueous solution.

15            The specification is also very clear by citing

16   an example that distinguishes between the prior art foamed

17   process and the invention's non-foamed process.  You can see

18   here in this highlighted Example 5.  We know that that is

19   exactly what they were trying to achieve in the Example 5,

20   because in the prosecution history it tells us that Example

21   No. 5 illustrates the difference between a foamed asphalt

22   binder and a non-foamed asphalt binder.

23            Your Honor, we believe it is clear that persons

24   of ordinary skill would understand that incidental foaming

25   is not the same thing as a binder produced using a foaming

1     process.

2              So it's clear, Your Honor, that defendants'

3     construction simply can't be right.  If the claims precluded

4     even incidental foam, then all embodiments that are in the

5     patent, all of the examples would be precluded from the

6     claims, because the defendants, who say that minimum mixing

7     of additive and binder and aggregate produces foam, that

8     can't be right, because all the embodiments that are

9     disclosed in this patent involve the mixing of additive and

10    binder and aggregate.  And the Federal Circuit has made

11    clear that a construction that excludes all embodiments of

12    an invention is rarely, if ever, correct.

13             Your Honor, that's all I have on that particular

14    term.  Unless you have any questions, I will move on to the

15    coated terms.

16             THE COURT:  That is fine, counsel.

17             MR. CLIFFORD:  Thank you.

18             The key difference here between the plaintiffs'

19    construction and the defendants' construction is the extent

20    of coating on the aggregate.  The question is, does the

21    claim require all or substantially all of the surfaces to be

22    coated, or as the defendants would tell you, literally 100

23    percent coating of the binder on the aggregate?

24             There are a number of different terms, from

25    "coated" to "binder coated" to "coated with binder" and

1    "lubricating additive," to "coat" or to "coating."  These

2    all generally reference the notion of coating of the

3    aggregate.

4            Here is a representative claim term, Your Honor.

5    You can see, that's exactly how coating is used in the

6    context of aggregate.

7            Your Honor, plaintiffs' construction, which is

8    "having binder on all or substantially all surfaces," is

9    drawn from the specification.  The specification is replete

10   with words that characterize the type of coating on the

11   aggregate.  It uses words like acceptable and well coated

12   and good coating, adequate coating, thorough coating, and,

13   of course, 100-percent coating.

14           But the issue here is that our construction

15   contemplates all of those words.  The defendants'

16   construction, on the other hand, ignores most of those words

17   in the spec.  They focus only on "100 percent."

18           They would have the Court issue an absolute

19   characterization of the word coating, which we do not think

20   is reflected in the specification.

21           The defendants complain that plaintiffs'

22   construction is wrong because it has the word substantially

23   in it and that that in and of itself would require further

24   construction.  We don't believe that is the case, Your

25   Honor.  In fact, here is a number of cases, which I won't go

1       through in any detail, but I point out to you, Your Honor,

2       that they have approved the use of "substantial" in a claim

3       construction where the term substantial or substantially

4       doesn't actually appear in the claim term itself.

5                       Persons of ordinary skill are going to know that

6       coatings, when they come out of that drum, are not always

7       going to be a hundred percent perfect.  So while the words a

8       hundred percent does appear in the specification, it's

9       merely an example.  It is not intended, as a fair reading of

10      the specification would show, to be a limitation to be read

11      into the claims.

12                      Our view, Your Honor, is that the defendants are

13      cherry-picking this example and not being fairly

14      representative of the entire description in the

15      specification.  In fact, if you take defendants' proposed

16      construction to its logical conclusion, what they would

17      require is a microscopic examination of each particle of

18      aggregate to determine if it is in fact a hundred percent

19      coated.  That can't be what an ordinary person would

20      understand coating to mean, Your Honor.

21                      Your Honor, that is all I have on that

22      particular claim term.

23                      If you are ready, I will move on to lubricating.

24                      THE COURT:  Okay.

25                      MR. CLIFFORD:  Thank you, Your Honor.

1          Unlike any other term that we are going to talk

2     about today, this one has sort of strange bedfellows in the

3     sense that the alignment of the parties is a little

4     different.  The plaintiffs and Akzo Nobel actually agree on

5     what the construction of this claim term should be.  We

6     agree that no construction of lubricating is necessary for

7     any of the various lubricating terms.

8          Arr-Maz stands alone on this one, Your Honor.

9     They are arguing that the patent contains an express

10    lexicographic definition of lubricating, which we believe --

11         THE COURT:  I never heard that quite referred

12    to.

13         MR. CLIFFORD:  Lexicographic.

14         THE COURT:  I like it.

15         MR. CLIFFORD:  Glad I got it out.  I stumbled on

16    it before.

17         There are a lot of different lubricating terms.

18    I won't go through each one.  But generally, you will see

19    that our construction here sort of tracks the variations of

20    this particular term.  And the focus here, of course, is on

21    relating lubricating to additives or substances.

22         So at this point I would like to turn your

23    attention to the claim language.

24         You will see here that lubricating, even in one

25    representative claim, such as Claim 25 here, appears

1       numerous times, whether in reference to additive or other

2       type or the specific examples of the Markush group, like

3       lubricating surfactant, lubricating non-surfactant,

4       lubricating additive, and so on.

5                    Our view, Your Honor, as both plaintiffs and

6       Akzo agree, the lubricating terms all have their plain and

7       ordinary meaning, and there is no need to go any further

8       beyond that.

9                    However, we have, because of this proposed

10      construction that we faced with Arr-Maz's construction, we

11      felt it may be necessary for the Court to have an

12      alternative construction from the plaintiffs.  So that's why

13      we have offered "allowing easier motion between two or more

14      objects."  This alternative construction is simply a way of

15      explaining what we believe to be the plain and ordinary

16      meaning of lubricating.  It's consistent with the intrinsic

17      evidence and what the knowledge of a person of ordinary

18      skill would be.

19                   The dictionary, of course, helps with that.  But

20      the defendant Arr-Maz here would have you read into the

21      meaning of lubricating a very specific, frankly, complex

22      scientific definition that we do not believe the patentees

23      intended.

24                   Unlike lubricating, the patentees did expressly

25      define several terms.  We mentioned functionally dry

1    essentially water free, and there is another term called

2    visco-lubricity.  If I can direct your attention to two

3    places where those terms are expressly defined, Your Honor,

4    you can see the patentees knew exactly how to do that when

5    they wanted to.  They defined them expressly.

6          But that's not what happened with lubricating.

7    Instead, this definition that we are getting from Arr-Maz is

8    simply not in the specification.  You can't find "providing

9    a reduction in the normal force of an asphalt binder in an

10   additive as compared to the normal force of the asphalt

11   binder without the additive at high rotational velocities"

12   as a quotation from the specification anywhere.

13         It simply is not a direct quote.  It is not an

14   express definition taken from the specification.  Instead,

15   Your Honor, it is pulled from bits and pieces here and

16   there, none of which, together or in isolation, are

17   expressly linked to the word lubricating.

18         Instead, Arr-Maz uses portions of the

19   specification which are about different terms.  So

20   visco-lubricity is not the same as lubricating.

21         This test, which relates to determining normal

22   force measurements, is in the specification, but it relates

23   to the concept of lubricity.  It is not a replacement for

24   the plain and ordinary meaning of the word lubricating.

25         If you have any questions on lubricating, Your

1    Honor, I am done, and I am going to turn the podium over to

2    my co-counsel, Frank DiGiovanni, for the rest of them.

3                THE COURT:  Thank you.

4                MR. CLIFFORD:  Thank you, Your Honor.

5                MR. DiGIOVANNI:  Good morning, Your Honor.  We

6    start on Slide 58 of our presentation.

7                Mr. Clifford mentioned warm mix in his tutorial.

8    In fact, the video was entitled Warm Mix.  So what you see

9    in the claims, Your Honor, is the term warm mix used in

10   several different ways.  Principally, "warm mix asphalt

11   paving composition" or "warm mix paving composition," that

12   is one when warm mix is described in the composition.  The

13   second way is a "warm mix temperature," as you see here in

14   Claim 25 of the '725 patent.

15               So they are used the same way.  What we have

16   done in our slides, Your Honor, is just list how each side

17   is generally characterizing them.

18               There certainly is a difference between the way

19   plaintiffs are characterizing how we define warm mix and how

20   defendants do.  The way we are defining warm mix is as a

21   general differentiation from hot mix, because that's the way

22   the patentee uses it.  And that is the way all the intrinsic

23   and extrinsic evidence uses the term warm mix.  It is a

24   general term that differentiates this type of asphalt from

25   conventional hot application.  I am going to go through and

1    show you the intrinsic evidence in a moment.

2              I do want to note here this little piece of clip

3    art designates that this was actually a new construction

4    that we received from defendants.  Actually, the first time

5    we ever saw it was in their answering brief.  I want to note

6    that in our opening brief and our answering brief, we were

7    unable to address it because the only thing they said is it

8    was indefinite, and they didn't provide a construction until

9    that time.  I appreciate Your Honor giving us that

10   opportunity to submit that short and supplemental brief

11   wherein we address it.

12             As I said, the term warmed mix is a term that is

13   used to generally distinguish asphalt paving compositions

14   and processes that use a relatively warmer temperature to

15   that of conventional hot mix.

16             This slide indicates the difference between the

17   two.  The difference, Your Honor, between plaintiffs' and

18   defendants' construction -- this is a little graphic just to

19   illustrate that -- is both, everyone, all parties agree that

20   warm mix is "at least 30 degrees lower" than something, but

21   it's that something, that comparison product, or that

22   comparison composition, that we disagree on.

23             Plaintiffs say it's at least 30 degrees lower

24   than used in conventional hot mix asphalt.  And the language

25   that defendants use, it may look familiar to Your Honor

because they pluck it right out of the patent claims, which

sometimes is the way to go, you look at the claims first,

under Vitronics, but not here, Your Honor, because there is

a general concept of warm mix, and then there is also the

specific comparison that the inventors made in the claims.

So the general concept of warm mix is not

defined by the claim language -- I will call it the claim

comparison language.  But it's the general concept of warm

mix that is defined in reference to conventional hot mix.

These next couple of slides show you the

particular warm mix terms.  We have been calling them the

warm mix terms throughout briefing, just to show you that

it's warm mix temperature, warm mix temperature range.

They all follow the same essential structure, Your Honor.

These three, warm mix paving composition, warm

mix asphalt paving composition, and warm mix asphalt binder

composition, all parties agree it should be construed the

same.  All three of those terms then are the same.  It's

just a matter of which side is right, plaintiffs or

defendants.

Plaintiffs again follow their convention of

referring to conventional hot mix.  Defendants, again, use

that, they pluck language out of the claim again.  I will

get to that in a minute.  But that essentially renders the

term warm mix superfluous.

1           And these are two additional terms that have

2    warm mix in it, again, follow the same convention.

3           Let's take a look at the specification, Your

4    Honor, starting with Slide 64.

5           Looking at the intrinsic evidence, the

6    specification, and in the detailed description section, the

7    quotes here are from the patent, from the '725 patent, but

8    the specifications are the same.  So what we have here, you

9    have the applicants or the inventors discussing warm mixes,

10   discussing the prior art review here, they say, Earlier work

11   confirms that laboratory compaction of field-produced warm

12   mixes utilizing the reported foaming, lubricating solution

13   can be adequately compacted at temperatures approximately 30

14   to 50 degrees or more below typical hot mix asphalt

15   compaction temperatures."

16          So when warm mix is used in the general sense,

17   as here, it's done by reference to it being 30 degrees or

18   more or lower than conventional hot mix.  Here it says

19   typical hot mix.  Again, Example 7, same type of structure,

20   Your Honor.  Warm mix is referenced, they discuss warm mix,

21   and then they say, further on in Example 7, the applicants

22   say, "This same mixture when produced as a conventional hot

23   mix asphalt was mixed at a temperature of 300 to 310 degrees

24   Farenheit."

25          So when the term warm mix is used, it's done so

1        in reference to a conventional hot mix.

2                    Again, I am not going to belabor this point.

3        But suffice it to say that in Example 3 and Example 6, the

4        same type of convention is used by the applicants.  The

5        phrase is typical hot mix, again, typical hot mix is used

6        here.  I said I wouldn't belabor the point.  This is Example

7        9, it has a similar convention.  Again, they use the phrase

8        normal hot mix in reference to warm mix.

9                    So the comparison just for the term warm mix is

10       conventional, normal, or typical hot mix.

11                   One last piece of additional specification

12       support, Your Honor.  I specifically mention this one

13       because it comes very close to being lexicographical.  It's

14       very close to being definitional, Your Honor.  I won't say

15       it rises to the level of being a definition.  But it comes

16       about as close as you can to being an actual definition.

17       So what this is is, this is the WO international application

18       that is expressly incorporated by reference into the

19       specification.  And in that, the quote is, the first box

20       there, Your Honor, it says, "Recently, in an attempt to

21       combine the advantages of hot mix and cold mix processes,

22       warm mix processes have been reported."

23                   And it goes on a bit to discuss this new concept

24       of warm mix.  And then it says, and this is talking about

25       this prior art international application, it says, "The

1    present invention provides a process for bituminous paving

2    suitable for primary construction having significantly lower

3    mixing, paving, and compaction temperatures (temperatures

4    that are 30 to 80 degrees Farenheit lower) than for

5    conventional hot mix paving."

6              This tracks plaintiffs' proposed construction

7    for warm mix, 30 degrees or more lower than conventional hot

8    mix.

9              One note in the prosecution history, Your Honor,

10   and this is in our joint appendix, this argument was made

11   several times, twice, in the prosecution history.  The

12   applicants distinguished this Falkiewicz reference, arguing

13   that Falkiewicz discloses these asphalt binders to

14   conventional hot mix temperatures.  And the applicants say,

15   "There is no teaching or suggestion in Falkiewicz of warm

16   mix asphalt paving compositions."

17             So they are using it, it may be called

18   shorthand, but for them to say Falkiewicz does not have warm

19   mix, they say, no, no, Falkiewicz has conventional hot mix

20   temperatures.  Here is the temperature range.  The invention

21   is warm mix.

22             That is how the term warm mix is generally used

23   in the intrinsic evidence.

24             A little bit of extrinsic evidence.  I am not

25   going to belabor this.  It is in our brief.

1          One last piece -- this is extrinsic evidence.

2     But we do cite a case that said this is particularly

3     relevant.  Defendant Akzo itself, in one of its own patents,

4     one they have actually raised and one of their defenses

5     here, this '011 patent of Akzo, the title is Asphalt

6     Modifiers for Warm Mix Applications.  In one of the claims

7     they say, "The formulation of Claim 14 wherein the

8     temperature required is 15 to 60 degrees Farenheit lower

9     than," you guessed it, "conventional hot mix asphalts."

10    That's the phrase that we think warm mix asphalt is defined

11    by.

12          One final slide on warm mix, Your Honor.

13          So looking at defendants' I will call it new

14    construction, but their construction, as I said, is taken

15    verbatim from the claims.  The problem with that is, that

16    verbatim language is also a separate limitation.  No one is

17    reading that out.  Plaintiffs understand, we need to meet

18    that limitation.  But there is also the warm mix limitation.

19    By defining a warm mix as that exact limitation, it renders

20    the term warm mix superfluous.  And we say, and the Federal

21    Circuit says, Your Honor has said, you don't do that.

22          So that is essentially all I have on warm mix.

23    I guess the one additional point is, and I am going to move

24    to the comparison terms, is that, and there certainly is a

25    difference, we believe, plaintiffs believe, between the

1    concept of warm mix and the concept of the apples-to-apples

2    comparison that Mr. Clifford spoke of earlier.  And the

3    apples-to-apples comparison is embodied in the comparison

4    language, which I will move on to next, unless Your Honor

5    has any questions.

6              THE COURT:  That is fine, Mr. DiGiovanni.

7              MR. DiGIOVANNI:  Okay.

8              The next group of terms all the parties have

9    been calling the comparison terms throughout the briefing,

10   which ends up being ironic, because defendants end up trying

11   to read out one of the words comparison, in fact, they

12   eliminate it.  If we can just take a look quickly at what

13   the comparison terms are.  And the definition quoted here is

14   for comparison temperature.

15             So Claim 25 of the '725 patent claims a warm mix

16   asphalt paving composition comprising, then it lists some of

17   the limitations that Mr. Clifford argued.

18             Then toward the bottom, it says wherein the --

19   this is the asphalt paving composition, "Wherein the warm

20   mix asphalt paving composition is produced at and is at a

21   warm mix temperature at least 30 degrees Farenheit lower

22   than a comparison temperature needed to produce a comparison

23   paving composition containing binder-coated aggregate

24   without the lubricating additive."

25             As Mr. Clifford touched on, the claimed

invention, the composition that's claimed, the temperature

is compared to the comparison temperature needed to produce

a comparison paving composition.  So, important is, the

second word comparison there is particularly important,

because it is not compared to the temperature required to

produce any paving composition.  As Mr. Clifford said, there

are a lot of different grades, a lot of different types of

paving compositions.  There needs to be a comparison of

paving composition.  And under plaintiffs' construction,

that word comparison is best understood as comparable.

Defendants, on the other hand, read that out

completely.

So this slide here, Slide 75, compares

plaintiffs' and defendants' constructions, and you can see

the difference.  And the key difference is this word

comparable which is in plaintiffs' construction, and

defendants have completely eliminated that concept of a

comparison product or a comparable product.

I will note, Your Honor, there is this

additional language in defendants' construction, this

containing binder-coated aggregate.  As we said in our

supplemental brief, we have no issue with that.  We don't

think it's necessary , but it's fine to include that in

there.  Had they presented that to us during the

meet-and-confer, we certainly would have agreed to it.

1          So let's take a look at -- we have already

2     looked at the claim language, Your Honor.  The concept of

3     comparable is embodied in the claim itself by this second

4     word comparison.

5          In the specification, if we take a look at Slide

6     77, it's also, this concept of the claimed invention being

7     compared to a comparable paving composition, not just any

8     paving composition, is embodied at least in the example.

9     So here you have Example 7, Example 11.  Example 7 is making

10    the comparison by saying that the comparison product in

11    Example 7, Your Honor, is, they say, the same mixture when

12    produced as a conventional hot mix asphalt.  So when the

13    invention is being compared to this comparison product, they

14    say it's the same mixture except that it's produced as the

15    conventional hot mix asphalt.  It is not just any comparison

16    product.

17          Same with Example 11.  It sets forth data

18    comparing the hot mix version and the warm mix version

19    essentially of a single type of asphalt composition.

20          This next slide indicates some prosecution

21    history.  This particular piece of prosecution history, Your

22    Honor, is directly on point and illustrative of plaintiffs'

23    construction.

24          So here you have the applicants explaining an

25    amendment they made to Claim 1.  They say, "Claim 1 has been

1    amended to recite that the listed lubricating additives

2    provide an asphalt binder composition that allows a

3    significant reduction in the temperatures used to coat

4    aggregate for use in paved surfaces compared to similar

5    asphalt binders that do not include these lubricating

6    additives."

7              So the comparison product, as described in the

8    prosecution history, they say it's a similar asphalt binder

9    that does not include an additive.

10             So it is an apples-to-apples comparison, the

11   comparison claim language.  We, plaintiffs embody that in

12   their construction, their proposed construction, Your Honor,

13   by using the word comparable.  Defendants eliminate that

14   second word comparison completely.

15             And on 79, the case law says you can't just read

16   out a word, a term.  That is what defendants are doing.

17             Slide 80 I believe is my final slide on

18   comparison terms, Your Honor.  Essentially, Slide 80 is

19   intended to emphasize that they have, defendants have used

20   the word "a" instead of the concept of comparison.

21             So their construction is "the minimum

22   temperature needed to produce a paving composition

23   containing binder-coated aggregate without the lubricating

24   additive."

25             There needs to be a concept of comparable there.

1   We saw in the specification, in the examples, there was

2   similar, or an apples-to-apples comparison.  Plaintiffs'

3   construction does that by using the word comparable.

4   Defendants' construction reads it out.

5               Your Honor, that is all I have on the comparison

6   terms.

7               THE COURT:  The word "is"?

8               MR. DiGIOVANNI:  That's correct, Your Honor.

9   The next term is "is produced at, is at."  The answer is,

10  yes, in a way we are disputing the word is.  Your Honor,

11  plaintiffs' construction uses what we believe is not only

12  the meaning, the commonly understood meaning of "is," but

13  also the meaning understood and ruled on by the Federal

14  Circuit, as well as what is in the patent.

15              So the claim language itself, Your Honor --

16              THE COURT:  Let's let them swim on this one.

17  Why don't you move on.

18              MR.  DiGIOVANNI:  Okay, Your Honor.  I was going

19  to also move on from viscosity modifier and dispersant

20  viscosity modifier, Your Honor.  We didn't receive a

21  construction from defendants.  I think our briefs stand on

22  their own.  We do rely on extrinsic evidence definitions in

23  contemporaneous documents.  But I will move on from that.

24              The last one, just very briefly, Your Honor, is

25  suitable aggregate.  And this is another term where we

1    didn't receive a construction from defendant.  And it

2    appears that defendants' chief complaint is that the word

3    suitable shouldn't be in a construction or in the term,

4    number one, or in the construction.  I am not sure which

5    position, maybe they are taking both positions.  Certainly,

6    Your Honor, Slide 91 indicates that.  A number of courts

7    have understood that, including Your Honor in the Talecris

8    case.

9               I have nothing else on suitable aggregate.  And

10   that does conclude our opening presentation, Your Honor.

11              THE COURT:  Thank you, Mr. DiGiovanni.

12              MR. DiGIOVANNI:  You are welcome.

13              THE COURT:  Let's hear a response.

14              MR. DeLUCIA:  May it please the Court, Your

15   Honor, Rich DeLucia for defendants in the case Akzo Nobel

16   against --

17              THE COURT:  I am assuming you have slides.

18              MR. DeLUCIA:  I do.

19              I am going to go in a slightly different order,

20   maybe, to accomplish a little back-to-back, I will go to

21   warm mix terms first, since those probably are freshest in

22   everybody's mind, at least in mine, at this point.

23              THE COURT:  However you want to proceed,

24   counsel.

25              MR. DeLUCIA:  Great.  Thank you.

1          Let's go to our Slide 2.

2          Your Honor, on the warm mix concept of this

3    claim in this patent, the difference in our position was

4    articulated at least at one point by opposing counsel when

5    they said that the defense is attempting to, or is, in fact,

6    proffering to the Court that we should stay very literal to

7    the claim language and not introduce concepts or new words

8    from the patent specification when it comes to the

9    definition of warm mix in the context of this claim, because

10   that is precisely what I am proffering to the Court.

11         This is a claim, Claim 1 of the '725 is to a

12   warm mix asphalt composition.  We have spoken a lot about

13   prior art and background, which do not alter the words of

14   the claim, nor the patent specification, nor do I want to

15   burden everyone with a discussion of what the prior art now

16   review is versus the claim.

17         The question is, what does the claim define the

18   new, allegedly new warm mix to be?

19         What we are saying is that the text of the claim

20   says that, "Wherein the warm mix asphalt paving composition

21   of this claim is produced at" means that, then it goes on, a

22   warm mix temperature, then it has the so-called comparison

23   phrase.

24         All we are arguing what the difference is is

25   that a warm mix is defined within the text of the claim

1   expressly and simply as this comparison of apples-to-apples,

2   as counsel said, composition with and without the additive.

3                 So if it drops 30 degrees without the additive,

4   and you can't mix at 30 degrees lower temperature without

5   the additive and compact without the additive at a

6   30-degree-lower temperature, it is not a warm mix of this

7   claim.

8                 So there is no temperature in the claim, Your

9   Honor, for warm mix.  It is defined in our position by the

10  comparison that's set forth there.  There is no mention of

11  what a conventional hot mix temperature is.  In general,

12  typically, or conventionally in the art, either in the

13  specification or in the claim, the word conventional hot mix

14  appears nowhere in that claim.  And warm mix is defined in a

15  way with respect to this comparison that we have been

16  talking about.

17                I am going to talk a little bit about why I say

18  that that is so true.

19                First of all, this warm mix asphalt has, as

20  claimed, three compositions.  The asphalt binders we have

21  spoken about, the lubricating additive, which is allegedly

22  new, we say has been in the art -- but that's for another

23  day -- and the various additives, the sand, the gravel, the

24  wrap, the reclaimed asphalt pavement.

25                Now, we are talking about literally thousands of

1       potential raw components that can be used, all of which are

2       different, all of which give rise to different temperatures,

3       processing conditions, and the like.

4               So generalizing as to what a warm mix is in

5       general by range of temperatures or even what a conventional

6       hot mix would be in a range of temperatures with the

7       universe of different broadly recited components you can

8       have is why, in fact, there is no definition of a precise

9       temperature in this claim.

10              Now, why am I saying this?

11              Let's go to the intrinsic evidence that is the

12      basis of this language in the claim.  I would put up right

13      now, if we can go to Slide 5 -- and I am taking a little

14      advantage of the background Your Honor already has, that

15      counsel has provided here, in going right to the very basis

16      in the patent specification where all this appears.

17              Before going to that, the Patent Office also

18      noted during reexam prosecution that there are no specific

19      temperatures in the claims.  And that is my Slide 4.

20              Going to Slide 5, here is the basis of the

21      statement, the actual basis of the statement and the

22      comparative language in the claims we are discussing, which

23      defines hot mix right in the text of the claim.

24              What this says is, "Both the first, second and

25      third embodiments of the present invention," which is all

1    the additives recited by the claims we are discussing, "may

2    be mixed with aggregate at a temperature of about 280

3    degrees Farenheit and lower temperatures (where this mixing

4    temperature may be a function of the original or starting PG

5    asphalt rate.)"

6             That is the asphalt bitumen which comes in

7    different grades.  We all have some familiarity with

8    pavement.  You can just imagine the variations you could

9    have.

10            So the specification is not out of order in

11   saying we don't want to be limited to these temperatures

12   because of the variety of scientific material you can mix

13   that would give rise to these different temperatures.  And

14   it says it.  But 280 degrees is an example of a warm mix

15   temperature.  But, of course, it's a function of what you

16   picked as the asphalt binder, a function of your additive.

17   They talked about there being various amounts of moisture in

18   aggregate.  You go from sand, to ground rock, to aggregate,

19   any solid material in there, I believe.

20            So the specification says, no one would be

21   bound, and rightfully so, and that any resultant mixture

22   "may be compacted at a temperature about 260 degrees and

23   lower."

24            So there are two different temperatures we are

25   talking about, lest we not focus on this.  One is the mixing

1    of the materials, you mix it in that extruder-like device

2    they showed, and then you put it in the trough and take it

3    and pave it, so there is a compaction warm mix temperature

4    and there is a mixing temperature.  What this says is that

5    hot mix asphalt mixtures produced from the same binders not

6    utilizing the present invention, which are those additives,

7    are reasonably anticipated to require mixing temperatures

8    and compaction temperatures higher than those stated above.

9              And this is just one example from the discussion

10   in Column 12 that lays this comparison out.

11             So what are we really saying?

12             The specification and the claims say a warm mix

13   within the context of this variable blend.  When you take

14   out the alleged novel additive, the lubricant, and you make

15   that composition without the lubricant, the temperature

16   required for mixing and compaction is 30 degrees higher.

17   Another way of saying it is, when I add in the additive, I

18   lower the temperature required for mixing and compaction 30

19   degrees.

20             That's what the claim says, that's what the

21   specification explains, why that is the case.  The claims do

22   not say what the warm mix temperature is.  It is a way of

23   broadening the claim.  It doesn't say compared anywhere with

24   any arbitrary conventional hot mix.  This patent

25   specification never says what a conventional hot mix is.

1      You were shown something that was described as

2  lexicographical from the international EPO application that

3  is incorporated.  But that is a patent on a different

4  composition entirely.  In fact, it's a prior art reference,

5  which the portion that was said to be lexicographical, which

6  it really isn't, because what I am showing you here is the

7  intrinsic evidence that's relevant, is on a completely

8  different composition and discussing different things.

9      I think it's very far afield and improper to go

10  to extrinsic evidence to read words into -- that is

11  extrinsic in the sense that it is dealing with a different

12  composition of matter even though it is incorporated into

13  the application.

14      THE COURT:  It's your contention what I was

15  shown is not part of the intrinsic record.

16      MR. DeLUCIA:  I believe it's not properly

17  considered part of the intrinsic record for interpreting

18  language in this specification, particularly where, Your

19  Honor, the language of this specification and claims are

20  consistent completely with what we are saying and what the

21  claims say and do not include these comparisons with

22  conventional hot mix temperatures nor conventional warm mix

23  temperatures.

24      When we said comparison terms, let's go to that

25  now, because I don't know that the difference between us is

1    understood the same way -- and maybe the difference between

2    us can be reduced for Your Honor's deliberations in terms of

3    what these comparison terms are saying.

4              So if we go down -- before I get there, let me

5    go through with you the difference between our warm mix

6    temperature constructions.

7              Plaintiffs' proposed construction -- this is my

8    Slide 6 -- they say warm mix temperature means a temperature

9    at least 30 degrees lower than used in conventional hot mix

10   asphalt.

11             I say that is completely incorrect, unnecessary,

12   uncalled for by the claim language, and unsupported in the

13   intrinsic evidence, and there is no need to compare the warm

14   mix with any conventional hot mix.  You have to compare

15   apples to apples, as they said.  And I am going to get to

16   that right now.

17             So let's go to the so-called comparison

18   language.  On my Slide 8 --

19             THE COURT:  I have it here.

20             MR. DeLUCIA:  On my Slide 8, Your Honor, this is

21   directly from the claim language, "a comparison temperature

22   needed to produce a comparison paving composition containing

23   aggregate without the lubricating additive."

24             So in other words, the standard is the

25   composition, the paving composition, the control.  Like in

1    science you have a control, with and without the drug.

2    With the drug you are cured; without the drug the patient is

3    sick.

4              This is like that.  It's just like that.  It's

5    saying that with the additive the temperature goes down 30

6    degrees relative to the comparison temperature, which is the

7    same blend, the same aggregate, bitumen, or binder without

8    the additive, which is the logical control, the apples to

9    apples.  And when there is a comparison mixing temperature,

10   you have to be unable to mix 30 degrees, at a

11   30-degree-lower temperature without the aggregate.  For

12   compaction, you have to not be able to compact without the

13   additive at 30 degrees lower.

14             That is precisely what the portions of the

15   specification I showed you earlier from Column 12 repeatedly

16   say.

17             It's the same composition compared, and is

18   compared for the ability, in accordance with Column 12, to

19   compact or mix.

20             So I think this terminology defines warm mix,

21   these comparison terms.  We did not mean to deviate from

22   that clear, concise comparison that I see recited in the

23   claim and supported by the intrinsic evidence.

24             What I do get concerned about, Your Honor, and

25   what I would -- so we would proffer that the warm mix is

1     defined intrinsically in the claim and in the intrinsic

2     evidence as the definition of this comparison in the claim

3     language.  And neither party should deviate and add a word

4     like "a comparable," "comparable."  By "comparable," I don't

5     know what new parameters are being added.  But I can assure

6     you, by not saying a comparison, which is the exact claim

7     language, we didn't intend to deviate from the

8     apples-to-apples comparison that the literal claim language

9     calls for.

10          So the literal claim language, understood to

11    require a comparison with and without the additive, is

12    acceptable to defendant.  And if without the additive you

13    require a 30-degree-higher temperature, you cannot mix or

14    compact within that 30-degree difference that's called for

15    by the claim, when you compare the same apples-to-apples

16    comparison, you don't have a warm mix.  If it lowers the

17    temperature 30 degrees from that comparison, when I add the

18    additive, you do have a warm mix.  That's what the claims

19    say, the spec says, and there is no need to get into

20    conventional warm mix, conventional hot mix type terms in

21    light of the intrinsic evidence.

22          That is our conservative view of the Markman

23    claim construction.

24          Warm mix temperature range, which is another

25    group of claims, which we discussed, is all subject to the

1    same arguments I have just made, Your Honor, exactly, I

2    believe.

3             Now, since we are switching back and forth, I

4    will do another term that I am doing and move on to

5    non-foamed.

6             So the claims recite non-foamed asphalt binder.

7    Now, reading it expressly, it is a composition-of-matter

8    claim.  It has the word non-foamed in it.  Counsel spoke

9    about something referred to as incidental foam, and then

10   said their claim construction should be that, in fact,

11   non-foamed means not produced using a foaming process, which

12   was articulated to be a prior art foaming process.

13            So if you don't use a prior art foaming process,

14   then even though your composition contains foam, it is

15   non-foamed.

16            Now, I don't know, and the Markman claim

17   construction doesn't reflect, what even a foaming process

18   is.

19            They mean by foaming process, and they said, I

20   believe -- and I don't mean to put words in their mouth --

21   but I believe they said that a foaming process is the prior

22   art prior art foaming process.  So all they exclude by

23   non-foamed in a compositional sense is the prior art.  Now,

24   I say, if there is foam in a composition that says

25   non-foamed composition, and I have foam in the accused

1     product, the argument that that was made by a foaming

2     process is there.  How could I have foam not made by a

3     foaming process?  They say, that is just incidental foam.

4     That is an infringement argument and not a claim

5     construction.  The claim construction says that the

6     composition does not contain foam.

7                 If it contains foam, it is excluded from the

8     scope of the claim.  If there is foam present and they said

9     that's not really foam, that's something else, that's

10    different.  But if there is foam present, then the argument

11    that is excluded by the literal claim language that says

12    non-foamed is very strong.  And it is very unusual to take a

13    compositional element, call it incidental, read it out of

14    the claim, and say that the claim to a composition only

15    excludes prior art foaming processes, because it says

16    non-foamed asphalt binders.  And if there is foam present,

17    it appears to be expressly excluded from the scope of the

18    claim.

19                 There is no definition of incidental foam.

20    There is no definition of what they mean by a foaming

21    process if you have a non-foaming process if you have foam

22    present.

23                 So we are building in a lot with their proposed

24    construction, a lot of contradiction, I believe, to the

25    express claim terms.  Non-foamed means no foam present in

1    the asphalt binder.  If there is foam present, it's

2    literally excluded by the scope of the claim, and there is

3    nothing in the prosecution history or in the specification

4    that ameliorates the express claim language.

5              I believe that's my story or my side of the

6    story on non-foamed.

7              At this point, Your Honor, I will pass it to my

8    colleague, Ms. Moken.

9              Thank you very much, Your Honor.

10             THE COURT:  Thank you, Mr. DeLucia.

11             MS. MOKEN:  I will begin, Your Honor, with the

12   coating-related terms.

13             THE COURT:  Ms. Moken.

14             MS. MOKEN:  Yes.

15             Defendants didn't fabricate a requirement for

16   100-percent complete coating of the aggregate, as plaintiffs

17   are arguing we did.

18             In fact, it is the patent claims and the

19   specification that actually require this 100-percent

20   complete coating.  You can look at the claims here.  And

21   coating terms are highlighted for Your Honor.  There is no

22   qualification before the word "coating" or "binder coated"

23   or "to coat" in any of these claims that says partially or

24   substantially.  It's perfectly clear, we are talking about a

25   complete coating.  That is confirmed in the specification as

1     well.

2          The specification makes clear on numerous

3     instances that a 100-percent coating of the aggregate is

4     what is achieved through the use of this process.  It's

5     what's required.

6          The specification also requires a thorough

7     coating of the aggregate.  That is used in a general sense,

8     in a general discussion about the subject matter claimed in

9     the patent, that there is a particular temperature needed to

10    provide a thorough coating of the aggregate.

11         Now, what does thorough mean?  Thorough means a

12    completing coating, a coating without omission.  It is not

13    partial.  It is perfect.  That is exactly what defendants

14    have proposed.  Defendants have required a construction that

15    is required by the claims and the specification:  An

16    aggregate 100-percent coated with binder.

17         Plaintiffs have been talking a lot about this

18    apples-to-apples comparison.  And that thorough 100-percent

19    coating is exactly what the specification and claims require

20    for there to be an apples-to-apples comparison.  And that's

21    because the degree of coating actually affects the

22    temperature at which the compositions that are talked about

23    in the claims need to be mixed.  If you will recall, there

24    is this comparison between the mixing temperature of the

25    warm mix composition and the lowest necessary temperature

1    needed to produce the comparison composition, which is the

2    same composition without the lubricating additive.

3              Now, in order to have that apples-to-apples

4    comparison of these temperatures, there needs to be a

5    precise end point.  And that end point is determined by

6    having a complete coating.  You otherwise can't have an

7    apples-to-apples comparison, because you will be modifying

8    the temperature which is needed to have that end point, to

9    have that comparison composition, and have a precise

10   temperature comparison to determine if something is falling

11   within the scope of the claims.

12             Now, what plaintiffs have done here is, they

13   have tried to rewrite the scope of their claims.  And they

14   want to require having binder on all or substantially all of

15   the surfaces.  Now, there is no discussion of what

16   substantially all means in the patents.  There is no

17   discussion or even use of the phrase "substantially all"

18   with respect to coating.  And it certainly doesn't appear in

19   the claims.  The claims, as we have talked about, are

20   unqualified.

21             "Substantially" the courts previously have had

22   trouble even construing.  And that's when the word appears

23   in the claims themselves.

24             Here, what plaintiffs are doing is trying to

25   inject this "substantially all" phrase to expand the scope

1    of their claims.  And that is impermissible under Markman

2    doctrine.

3                    I will move on to functionally dry and

4    essentially water free," unless you have any questions.

5                    THE COURT:  No.

6                    MS.  MOKEN:  "Functionally dry/essentially water

7    free" is used with respect to a description of the water

8    content of the asphalt binder.

9                    Now, the patent expressly defines what

10   functionally dry and essentially water free means.  In fact,

11   it says that these phrases are used to mean or intended to

12   refer to an asphalt binder composition that contains less

13   water or moisture than is routinely used in conventional or

14   known warm mixes.

15                   Now, when the patentee acts as his own

16   lexicographer and actually gives an express definition such

17   as this in the patent, that's what controls.  That is the

18   end of the claim construction analysis.  And that definition

19   must be applied.  And it is precisely that definition that

20   defendants contend should be applied in this instance.

21                   Now, what plaintiffs do, on the other hand, is

22   they modify that definition, that express definition.  They

23   try to say that, oh, conventional means foamed or

24   emulsified.  Not only do they try to say conventional or

25   known means foamed or emulsified, but they limit it through

1       the use of the "i.e."

2               The patent specification, as you have heard

3       already, does give examples of conventional warm mixes as

4       foamed or emulsified.  But that's not the end all and be

5       all.  It doesn't say conventional warm mixes mean foamed or

6       emulsified.  And they entirely ignore the fact that

7       "conventional" is followed by "or known."

8               Plaintiffs stated earlier today when they were

9       giving their initial presentation that earlier warm mix

10      technologies do include "foamed asphalt and emulsified

11      asphalt," and I am quoting, "among others."  And that's

12      exactly what they are ignoring.  They are ignoring the

13      "among others."  They are ignoring the "or known" in their

14      construction.  And they are trying to limit it just to this

15      "foamed or emulsified."  And that is impermissible.

16              Plaintiffs also raise the issue of a 112

17      problem.  And they said that defendants' proposed

18      construction has 112 issues and therefore should not be

19      adopted.  But those same issues that defendants contend

20      exist with respect to that express definition in the patent

21      of functionally dry and essentially water free, namely,

22      routinely used, and the word conventional, because those are

23      not defined, those still exist with respect to plaintiffs'

24      construction as well.

25              THE COURT:  I don't recall allowing the

1    plaintiff to discuss 112 issues.

2              MS. MOKEN:  Your Honor, unfortunately, they did

3    with respect to this issue.  That is the only reason I

4    address it.

5              THE COURT:  I do not think they did, counsel.

6    I think you should move on.

7              MS. MOKEN:  I will.  I will move on to "is

8    produced at and is at," unless you have any other questions.

9              The phrase "is produced at and is at" refers to

10   the warm mix temperature at which the warm mix composition

11   is being made.  The portion "and is at" that appears in

12   italics is a portion that was added during reexamination, a

13   prior reexamination, for the purposes of patentability.

14   Defendants contend that the only sensible construction of

15   this phrase is that the composition is produced at that warm

16   mix temperature and then is at that warm mix temperature,

17   and that the composition would have to be produced at and be

18   at that same warm mix temperature to fall within the scope

19   of this claim.

20             THE COURT:  At the produced temperature?

21             MS. MOKEN:  Yes, the production temperature.

22             THE COURT:  Okay.

23             MS. MOKEN:  Plaintiffs' proposed construction,

24   on the other hand, introduces this nebulous phrase, "at some

25   point after production."  I don't know what that means.

1     They don't define what that means.  And that's not talked

2     about anywhere in the intrinsic evidence.

3              THE COURT:  You may not know.  But would a

4     person skill know?

5              MS. MOKEN:  I don't believe a person of skill

6     would know, because it's not part of the intrinsic evidence.

7     It's something that is newly introduced by plaintiffs here

8     to change the scope of their claims.

9              What happens here with this construction that

10    plaintiffs propose is that at some point after production it

11    actually allows for an increase in the temperature or a

12    decrease in the temperature of the composition before it's

13    returned to that production temperature.  And that's not

14    something contemplated anywhere in the intrinsic evidence.

15             So plaintiffs' attempt to modify the scope of

16    their claims should be met with a rejection of their

17    construction.  And I maintain that defendants' proposed

18    construction is really the only sensible reading of what

19    "produced at and is at a warm mix temperature" means.

20             I will move on to "suitable aggregate," unless

21    you have questions.

22             THE COURT:  I have doubt, not questions.

23             MS.  MOKEN:  Suitable aggregate is a phrase that

24    is only used in the '466 patent, Claim 20.  You can see it

25    highlighted here in 20, Section (b).  What makes the

1    suitable aggregate is nowhere defined in this claim.  And

2    not only is it not defined in the claim, but it's not

3    defined anywhere in the specification.  The only place the

4    phrase suitable aggregate appears is in a mixture of other

5    terms describing generally the invention, purported

6    invention.  But there is nothing here that actual tells you

7    what makes an aggregate suitable in the context of the

8    claims.

9              Now, we heard earlier today from plaintiffs

10   about all the many different types of aggregates there are.

11   They had a picture there that showed all these different

12   grains and large rocks and small rocks and sand.  We have

13   also heard from them that these aggregates have many

14   different properties.  But there is nothing that identifies

15   what would make something suitable for use in the

16   compositions.  Just by virtue of the word suitable, that

17   indicates that there is something that is not suitable as

18   far as an aggregate goes.  Of course, that would want to be

19   being avoided.  There is no guidance provided here.

20             THE COURT:  What guidance do you have for me?

21             MS. MOKEN:  Unfortunately, I don't.

22             THE COURT:  We are not going to talk about

23   indefiniteness today.

24             MS.  MOKEN:  No, I am certainly not , Your

25   Honor.  I am just arguing against plaintiffs' construction.

1                    THE COURT:  Sort of, but sort of you are not.

2      You are doing both.

3                    MS. MOKEN:  I don't mean to be.

4                    That concludes my argument on suitable.

5                    THE COURT:  Very fine, counsel.  Thank you.

6                    MR. DeLUCIA:  Your Honor, we are going to pass

7      the podium to our co-defendant.

8                    I want to clarify one point.  We didn't ask or

9      request a construction separate from Arr-Maz, but by no

10     means did we intend, as counsel said, to join them on the

11     terms that counsel for --

12                   THE COURT:  I didn't take that to be the case.

13     But it is noteworthy that you didn't offer a separate

14     construction.  You can't run away from that, Mr. DeLucia,

15     nor can Arr-Maz.

16                   MR. LEE:  I am glad he clarified, Your Honor.

17     I was going to clarify that point.

18                   Your Honor, Robert Lee on behalf of Arr-Maz

19     Custom Chemicals.

20                   I am only going to address one set of terms.

21     My colleague, Mr. Abhyankar, will probably very briefly

22     address another term, Your Honor, that will finish this up.

23                   THE COURT:  Do you have additional things you

24     want to say about lubricating?

25                   MR. LEE:  No, Your Honor.  I think counsel did a

1   wonderful job with it.

2               THE COURT:  I hope we are not going to have a

3   re-do.

4               MR. LEE:  No, Your Honor.  We are going to adopt

5   their arguments and we adopted them in the briefing for the

6   sake of brevity, and we will adopt them this morning.  I

7   don't have anything specific to add to that.  We are just

8   going to address new terms that Arr-Maz proposed.

9               THE COURT:  Good.

10              MR. LEE:  I assume, Your Honor, you didn't want

11  to hear it all over again.

12              THE COURT:  No, I don't.  Once is enough.

13              MR. LEE:  I am going address a series of terms

14  referring to the lubricating terms.  There is five of them.

15  We are really only going to --

16              THE COURT:  You can go ahead and get started.

17              MR. LEE:  Yes, Your Honor.

18              Your Honor, there is five lubricating terms, if

19  you will, "lubricating," "lubricated," "lubricating

20  additive," "lubricating substance," and the phrase

21  "lubricating substance consisting of an anti-stripping

22  agent."

23              Your Honor, we are of course not going to go

24  through all of five of those because they are all pretty

25  much the same issue for all of them.  We are just going

1       highlight the term lubricating, Your Honor.

2               Plaintiff offers a plain and ordinary meaning

3       construction or an alternative construction.  We offer a

4       specific construction, Your Honor, that we believe is

5       supported by the specification and the intrinsic record.

6               Your Honor, we would submit that these terms we

7       believe are very important to the invention.  If you

8       listened to plaintiffs' counsel this morning, you look at

9       the patent, what they have said is, there is lots of prior

10      art, warm mix compositions --

11              THE COURT:  This is the benefit of not having

12      that thing (indicating), so you can pay attention to me.

13      Stop looking over there and look at me.

14              MR. LEE:  Yes, Your Honor.

15              The import of this invention is the addition of

16      additives, if you will, just lubricating additives over the

17      prior art, that is different than the foamed processes and

18      the prior emulsions.

19              So, Your Honor, we submit that, therefore, the

20      key component of the invention is this lubricating element,

21      that term needs construction.  And an ordinary meaning or

22      plain construction would not be appropriate.  How do you

23      distinguish this invention over the prior art if this is the

24      key component of that distinguishing feature?

25              Your Honor, we believe the intrinsic record

1          supports that.

2                    If you look at Column 2 of the '725

3     specification, and I am reading, Your Honor, "The

4     present" --

5                    THE COURT:  What line are you reading from?

6                    MR. LEE:  Column 2.

7                    THE COURT:  Line?

8                    MR. LEE:  Line 35.  "The present invention thus

9     relies in part in determining that the lubricating

10    properties of additives added to an asphalt binder or cement

11    are an important component of the present warm mix asphalt

12    mixtures and that it is not necessary or essential to use

13    foamed asphalt binders or emulsified asphalt binders."

14                   Again, Your Honor, this lubricating additive,

15    that is the distinguishing feature.  What is lubricating?

16    Otherwise, someone like my client Arr-Maz would not know

17    whether they fall within the scope of these claims.  For

18    example, you heard plaintiff refer to my clients used Adhere

19    with Cecabase.  It is a strange name, Your Honor, because it

20    is a product that contains two additives, if you will, put

21    in the same drum.  Both of those asphalt additives, Your

22    Honor, were on the market years before this patent was

23    filed.  If you put them in the same drum, Your Honor,

24    because supposedly they are lubricating, Your Honor, we

25    think that term needs some meaning.

1           Your Honor, I am going to destroy this word, but

2   we submit that plaintiff acted as his own lexicographer here

3   when looking as this term.  If you are looking at the patent

4   itself, Your Honor, Column 5, Lines 12 through 24, "While

5   not intending to be bound by theory, the present invention

6   is based in part on the observations that the lubricating

7   agents and additives disclosed in this application provided

8   warm mix having desired visco-lubricity characteristics or

9   properties.  As used in this application, the term

10  visco-lubricity means a characteristic of a material that it

11  exhibits under high rotational velocity as the gap fitness

12  of the material being tested approaches zero."

13          Skipping -- I will read it for completeness.

14          "As the gap thickness is reduced and as

15  rotational velocity is increased, the material's viscosity

16  begins to decrease, the normal force between the plates

17  begins to increase.  A material that has good

18  visco-lubricity characteristics will exhibit less than

19  normal force increase than one which has poor

20  visco-lubricity."

21          THE COURT:  Does it say "depend on" or less

22  normal"?

23          MR.  LEE:  That says "will exhibit less than

24  normal force increase than one which has poor

25  visco-lubricity."

1          THE COURT:  Given the importance of words.

2          MR. LEE:  Yes, Your Honor.

3          Now, we have heard plaintiff complain that we

4    are using words interchangeably, that the term

5    visco-lubricity is somehow different than lubricity or

6    visco-lubricity is different than lubricating.  Your Honor,

7    we submit in that section of the patent, again, Column 5, it

8    uses those terms interchangeably.  The patent doesn't use

9    with any claim language visco-lubricity.  It uses

10   lubricating, Your Honor.

11         Separately, Your Honor, we have identified or

12   you heard plaintiff reference that there is a very specific

13   test in this patent for how you determine what is a

14   lubricating additive, which referred to this lubricity test.

15         I have to say I was a little surprised their

16   counsel somehow argued that that lubricity test is somehow

17   irrelevant or unrelated to this issue.  That's this

18   invention.  That's what it is.

19         If you are looking at, again, the patent, it is

20   going to be on the '725 patent, Column 6, beginning with

21   Line about 48, Your Honor.  It is laboratory testing of

22   lubricity.  There is the word lubricity.  I am not a grammar

23   expert.  But here is the argument.  That is certainly the

24   same explanation for the lubricating elements in these

25   claims.  In fact, if you do the test and you look at what is

1    claimed, there is a five-step test.  Lubricating additive is

2    specifically referenced in the test, Claim 3 -- excuse me,

3    Element 3 of the lubricity test.  "A small quantity of the

4    asphalt cement or asphalt cement plus lubricating additive

5    was added to the bottom of the cup."  This is the test they

6    are running to determine the lubricating elements.

7            We will get to Element 5 of this five-step test

8    at the beginning of Column 7, Your Honor.  "The test we used

9    is a steady sheer test with increasing velocity."  Reading

10   down, Your Honor, to the last sentence, last two sentences,

11   "In addition, normal force increases, attempting to force

12   the plates apart.  The more lubricating character an

13   additive has, the lower these normal forces are."

14           Again, Your Honor, they use the term lubricity

15   or lubricating or visco-lubricity interchangeably to

16   describe the same element of the invention.  This is the

17   invention, Your Honor, the lubricating characteristics of

18   the additive, apart from the foaming and emulsification.

19   Because there is no available test, Your Honor, they invent

20   one to somehow claim this test is irrelevant to the

21   construction.  Your Honor, it is completely unfounded.

22           Looking to the construction itself, Your Honor,

23   specifically, we propose a construction of lubricating is to

24   provide a reduction in the normal force of an asphalt binder

25   with an additive as compared to the normal force of the

1    asphalt binder without the additive at high rotational

2    velocities.

3                Again, Your Honor, this tracks the language

4    specifically from the specification, Your Honor, to define

5    really what is the novel element of these claims, apart from

6    the prior art processes.

7                Thank you, Your Honor.

8                THE COURT:  Thank you, Mr. Lee.

9                MR. LEE:  With your admonition about 112 issues

10   clear, Mr. Abhyankar is going to briefly touch on the last

11   two terms.

12               THE COURT:  Good morning, counsel.

13               MR. ABHYANKAR:  Very briefly, Your Honor.  We

14   are going to be talking about the viscosity modifier and

15   dispersement viscosity modifier terms.  If you recall,

16   counsel indicated that they have relied on extrinsic

17   evidence for their construction.

18               THE COURT:  They did say that.

19               MR. ABHYANKAR:  There is a reason for that:

20   because there is no intrinsic support for their

21   construction.  And I just wanted to point that out.

22           I also wanted to point out that their intrinsic

23   evidence is two patents on unrelated technology and

24   unrelated patents to the patents in suit.  So we think that

25   those patents are completely irrelevant to this

1    construction.

2              Thank you.

3              THE COURT:  Thank you, counsel.

4              Does that complete the defendants' presentation?

5              MR. LEE:  That does for us, Your Honor.

6              THE COURT:  There is a fair amount to which

7    plaintiffs have to respond.  Let's take a quick stretch.

8              (Recess taken.)

9              THE COURT:  Please, take your seats.

10             Let's have our reply.

11             MR. CLIFFORD:  Your Honor, if I may, I would

12   like to speak to just four terms briefly.  Then I will turn

13   it over to Mr. DiGiovanni, who will speak on a couple more

14   terms.

15             THE COURT:  I hope one of you is going to

16   address Mr. DeLucia's assertions regarding what you relied

17   on and what you didn't, among other things.

18             MR. CLIFFORD:  Yes.  I believe Mr. DiGiovanni

19   will.

20             If you could bring up Slide 30, please.

21             Your Honor, this is the non-foamed term.

22   Counsel said in the presentation that they don't know what

23   foaming process means or refers to.  I would submit, Your

24   Honor, that foaming process is clear and unequivocal to a

25   person of ordinary skill in the art.  We went through

1        multiple slides from the specification, from the

2        incorporation of the WO, European application, which is

3        expressly incorporated by reference into the specification,

4        is intrinsic evidence.  And I would submit to Your Honor

5        that we don't have to spell out in detail a definition of

6        foaming process because it's clear in the specification what

7        foaming process refers to and it's known to what a person of

8        ordinary skill would know.

9                So it's not required under Federal Circuit law

10       to incorporate into the specification what a person of

11       ordinary skill knows.

12                Nevertheless, Your Honor --

13                THE COURT:  I agree with that.  I think perhaps

14       Ms. Moken didn't understand my question.  I don't know.

15                MR. CLIFFORD:  Thank you, Your Honor.

16                The other issue having to do with foam is,

17       counsel said that the patent states that the invention does

18       not contain foam.  Well, I would submit, Your Honor, that

19       the specification nowhere says that no foam anywhere is

20       required.  In fact, we did not see a single citation from

21       the defendants to the intrinsic evidence, whereas for

22       purposes of our proposed definition we cited numerous

23       examples of what foamed and foaming requires.

24                So it doesn't say no foam anywhere.

25                If you could move to Slide 40.

1              I am going to now address the coating claim

2     term, Your Honor.

3              With respect to coating, counsel said, We, the

4     defendants, didn't fabricate the coating requirement.

5     Well, of course, they didn't, because the coating

6     requirement is in the claims.  I never suggested that it was

7     in any way the defendants who created a coating requirement.

8     Sure, it's there in the claim terms.  But what they are

9     doing is ignoring the characterizations of the coating

10    requirement that are replete throughout the specification.

11             So the defendants want perfection.  You heard

12    that this morning.  It must be perfect.  Well, first off, it

13    doesn't say perfect.  It was extrinsic evidence that they

14    relied upon for some definition of thorough to require

15    perfection.  Instead, what we see is characterizations in

16    the specification for acceptable, well coated, good coating,

17    adequate, as well as thorough, and 100 percent.  I would

18    suggest that, taken as a whole, those words do not equate to

19    perfection.

20             And if you could go to Slide 41, please.

21             The defendants are ignoring these keywords like

22    adequate, good, well coated, and acceptable.

23             If you would move to Slide 25, please.

24             I am going to just very briefly with one comment

25    address the functionally dry, essentially water free claim

1    term.

2              Counsel said this morning that we are modifying

3    this express definition cited in the paragraph on Slide 25.

4    While we do rely on that paragraph and we believe that that

5    paragraph is important in construing functionally dry and

6    essentially water free, we don't believe that we are

7    modifying.  What we are clarifying is to defend against any

8    argument as to what conventional or known warm mixes mean,

9    because, in fact, the patentees, in the previous sentence,

10   they told us exactly what conventional warm mixes means.

11   They told us that it means foamed or emulsified asphalt

12   binders.

13             So we are not ignoring any aspect of the scope

14   of known, conventional or known warm mixes.  What we are

15   trying to do with our proposed definition is take the

16   express definition and make it clear from the previous

17   sentence as to what the full scope of the meaning of

18   conventional or known warm mixes is.

19             Then I would like to conclude, Your Honor, with

20   lubricating.

21             Slide 57, please.

22             You will recall, Your Honor, that counsel for

23   the defendants spoke about a very specific test that is set

24   forth in the specification.  And he said that I said it was

25   irrelevant or unrelated.  I did not say those words, Your

1          Honor.  I know that it is in the specification.

2                    What is clear is that the test is a way for the

3          patent to describe observations of the effects of the

4          invention.  The test is not the invention itself.

5                    So the lubricity effects can be measured through

6          the testing.  Lubricating is not the same.

7                    That is all I have, Your Honor.

8                    THE COURT:  Thank you, counsel.

9                    Mr. DiGiovanni.

10                   MR. DiGIOVANNI:  Thank you, Your Honor.

11                   Mr. Thomas, if you could put up Slide 68.

12                   So, Your Honor, I will address warm mix briefly

13         in response to Mr. DeLucia's statements.

14                   First and foremost, Mr. DeLucia made reference

15         to the WO international application.  That, in fact, was

16         expressly incorporated by reference, as you see in the

17         bottom here, '725 patent, Column 1, Lines 15 to 16, "It is

18         incorporated by reference herein."  That makes it intrinsic

19         evidence.  In fact, you don't even need to incorporate it by

20         reference.  It's just referenced.  It's intrinsic evidence.

21                   Certainly, this is intrinsic evidence, This WO

22         application.

23                   This is the particular language where I said it

24         comes very close to being definitional, about warm mix.

25                   So in this particular passage, very important

1    passage, the applicants -- actually, I think it's one of the

2    same common inventors on this -- but this reference

3    certainly references warm mix, and it makes reference to it

4    by pointing to temperatures 30 to 80 degrees lower than

5    conventional hot mix.

6              So, in general, I didn't hear Mr. DeLucia

7    address a dilemma that happens if their construction were to

8    be adopted.  That is, they render the comparison limitation

9    completely superfluous.  It would actually have that

10   limitation in there twice.  And the case law says you don't

11   do that.

12             What we tried to do, we went through the

13   specification and the intrinsic evidence and some extrinsic

14   evidence and came up with a definition of what is

15   understood, not to the lawyers, but to the person of

16   ordinary skill in the art, what does warm mix mean.  And

17   that's what we have done.  I don't need to repeat it, Your

18   Honor.

19             Comparison, the comparison term, Mr. DeLucia, I

20   think he conceded it four or five times, that the comparison

21   needs to be apples to apples.

22             THE COURT:  He did say that.

23             MR. DiGIOVANNI:  Mr. DeLucia also said we did

24   not mean to deviate from the claim language.  But defendants

25   certainly did deviate from the claim language.  They took

1      that second word comparison, which is very critical to the

2      apples-to-apples comparison, and they eliminated it.  They

3      used the word "a."  Completely eliminates.  So it could be

4      apples to bananas or pears or something else, Your Honor.

5                     We would say our language, our word, comparable,

6      captures the meaning of the comparison limitation.

7                     If you could bring up Slide 86.

8                     I sensed Your Honor didn't want to hear any more

9      about is produced at and is at, except that the result of

10     the defendants' construction would be for an eternity you

11     would have to have a road that is essentially at a

12     production temperature.

13                    Suitable aggregate, if we can go to Slide 91.

14                    Again, I guess what I heard was some criticism

15     of using the word suitable.  That's a word that has been

16     used a number times.  I didn't hear a response to this.  I

17     know Your Honor construed the same term.

18                    If you go two slides later, to 93.

19                    Your Honor, I will not talk about this.  This is

20     extrinsic evidence of our expert.  But I will note that the

21     construction, of course, has to be done from the

22     consideration of the person of ordinary skilled in the art

23     as to what they understand.  And in our briefing, we

24     certainly set forth what that person was, what the

25     educational components and experience component was.  And

1   that's the person that you need to look at as to what the

2   terms mean.  Defendants never actually gave us a person so

3   skilled, so I am not sure they adopted ours or any other

4   person.  But I think our briefing is straightforward on who

5   the person of ordinary skill is and what that person

6   understands.

7              Finally, Your Honor, viscosity modifier and

8   dispersant viscosity modifier.  In Slide 87 we do point to

9   some intrinsic evidence.  In the '466 patent and the '725

10  patent at Column 4, those terms are used.  And it's followed

11  by a number of types of chemical compounds that fall within

12  that.

13             Our definition tries to capture what those terms

14  mean.  And we do refer to extrinsic contemporaneous

15  documents for definitional purposes.  But by no means would

16  we think that means that it is indefinite or otherwise

17  undefined.

18             Your Honor, that is all I have.

19             THE COURT:  Thank you, counsel.

20             I will do my best to get an order out in 30

21  days, give or take.

22             Is there anything that we need to talk about

23  while I have you all in town?  Or is everything going

24  smoothly?

25             Good.  Counsel, thank you.

1              **(Counsel respond "Thank you, Your Honor.")**

2                              **-   -   -**

3      **Reporter:   Kevin Maurer**

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25